# LEASE

between

WWDC INDUSTRIAL PARK, LLC, Landlord

and

DC DIAPER BANK, Tenant



EXHIBIT

A

TABLE OF CONTENTS

Page

Introduction ..... 4

ARTICLE I - PREMISES AND TERM

1.1 Premises ..... 4
1.2 Term ..... 4
1.3 Commencement of Possession ..... 4
1.4 Option to Renew ..... 4

ARTICLE II - RENTAL

2.1 Basic Rent ..... 4
2.2 Annual Basic Rent Escalations ..... 5
2.3 Real Estate Taxes ..... 5
2.4 Snow Removal and Insurance Expenses. ..... Common Area Maintenance ..... 6
2.5 Gross Receipts Taxes ..... 6
2.6 Additional Rental ..... 7

ARTICLE III - USE AND OCCUPANCY

3.1 Use of Premises ..... 7
3.2 Tenant Requirements for Space Improvement ..... 8
3.3 Zoning and Permits ..... 8
3.4 Alterations ..... 8
3.5 Compliance with Laws, Ordinances, Etc. ..... 8
3.6 Hazardous Waste ..... 9
3.7 Fixtures, Etc ..... 10
3.8 Signs, Weight, Moving, Etc. ..... 10
3.9 Utilities ..... 10
3.10 Access ..... 10
3.11 Rules and Regulations ..... 10
3.12 Relocation of Tenant ..... 11
3.13 Subletting and Assignment ..... 12
3.14 Elements of Constructive Eviction ..... 12

ARTICLE IV - MAINTENANCE & REPAIRS

4.1 Repairs by Landlord ..... 12
4.2 Repairs by Tenant ..... 12

ARTICLE V - INSURANCE, DAMAGES AND CONDEMNATION

5.1 Insurance and Indemnification ..... 13
5.2 Damage by Fire or Casualty ..... 14
5.3 Other Damage ..... 14
5.4 Condemnation ..... 15

ARTICLE VI - SURRENDER OF PREMISES

6.1 Surrender and Restoration ..... 15
6.2 Tenant Holding Over ..... 15
6.3 Security Deposit ..... 15

ARTICLE VII - DEFAULTS

7.1 Defaults and Remedies ..... 15
7.2 Persistent Failure to Comply with Lease Requirements ..... 16
7.3 Bankruptcy ..... 16
7.4 Failure of Tenant to Perform ..... 17
7.5 Landlord's Security Interest ..... 17
7.6 Landlord's Liability ..... 17

ARTICLE VIII - LANDLORD'S MORTGAGE

8.1 Subordination ..... 17
8.2 Tenant's Estoppel Certificate ..... 17
8.3 Limited Liability of Mortgagee ..... 18
8.4 Notice to Mortgagee ..... 18
8.5 Attornment ..... 18
8.6 Approval by Mortgagee ..... 18

ARTICLE IX - MISCELLANEOUS

9.1 No Constructive Waiver ....................18
9.2 Broker's Commission ....................18
9.3 Waiver of Trial by Jury ....................18
9.4 Attorney's Fees ....................18
9.5 Time of Essence ....................18
9.6 Governing Law ....................19
9.7 Force Majeure ....................19
9.8 Notices ....................19
9.9 Successors and Assigns ....................19
9.10 Gender and Number ....................19
9.11 Section Headings ....................19
9.12 Personal Guaranty ....................19
9.13 Entire Agreement ....................19

EXHIBITS

Exhibit A – Space Plan ....................21
Exhibit B – Personal Guaranty ....................22

LEASE

This Lease made this 11th day of July, 2013, by and between WWDC INDUSTRIAL PARK, LLC, a Limited Liability Company, hereinafter called "Landlord", whose principal office is located at 1110 Bonifant Street, Suite #210, Silver Spring, MD 20910 and DC DIAPER BANK, A District of Columbia 501(c)3 corporation, hereinafter called "Tenant", whose principal office is located at 315 12th St., NE, #100, Washington, DC 20002.

WITNESSETH:
ARTICLE I
PREMISES AND TERM

1.1 Premises.

Landlord, for and in consideration of the covenants and agreements hereinafter set forth and the rent hereinafter reserved, has, and does hereby lease, unto Tenant and Tenant, subject to the terms and conditions herein contained, hereby leases from Landlord, the space described as follows: Approximately 3,050 rentable square feet of warehouse space located at 8858 Monard Drive, Silver Spring, MD 20910 in the building (hereinafter called the "Building") known as WWDC Building #5, located at 8850-8884 Monard Drive, Silver Spring, MD 20910, such leased space being hereinafter referred to as the "Leased Premises", and outlined on the plot plan attached hereto as Exhibit "A".

1.2 Term.

Subject to the provisions hereof, the term of this Lease shall be for a term of three (3) years and two (2) months, commencing on the 1st day of August, 2013, and ending on the 30th day of September, 2016, both dates inclusive. A "Lease Year" shall mean a twelve (12) month period beginning on the first day of the first full month of the term of this Lease or the anniversary of such day.

1.3 Commencement of Possession.

If Landlord shall be unable to give possession of the Leased Premises on the date of the commencement of the term hereof by reason of the fact that (a) the Leased Premises are located in a building being constructed which has not been sufficiently completed to make the Leased Premises ready for occupancy, (b) any tenant or occupant holds over or retains possession of the Leased Premises, (c) repairs, improvements or decoration of the Leased Premises or of the Building are not completed, or (d) for any other reason, Landlord shall not be subject to any liability for failure to give possession on said date. Under such circumstances, the rent reserved and covenanted to be paid herein shall not commence until possession of the Leased Premises is given or the Leased Premises are available for occupancy by Tenant, and no such failure to give possession on the date of commencement of the term shall in any other respect affect the validity of this Lease or the obligations of Tenant hereunder. However, if by the scheduled commencement date the Leased Premises are not ready for Tenant's occupancy, the commencement and expiration dates of this Lease shall be extended for the number of days that elapse between the scheduled commencement date and the date possession of the Leased Premises fully completed and ready for occupancy is tendered to Tenant, or as soon thereafter as the space is ready for occupancy. Landlord and Tenant agree to execute an instrument confirming the extended commencement and expiration dates. If permission is given to Tenant to enter into the possession of the Leased Premises or to occupy premises other than the Leased Premises prior to the date specified as the commencement of the term of this Lease, Tenant covenants and agrees that such occupancy shall be deemed to be under all the terms, covenants, conditions and provisions of this Lease.

ARTICLE II
RENTAL

2.1 Basic Rent.

(a) Tenant covenants and agrees to pay to Landlord for the Term hereof, an annual basic rent, hereinafter called "Basic Rent" payable in equal monthly installments in advance on the first (1st) of each calendar month pursuant to the following:

| Term | Annually | Monthly |
|---|---|---|
| August 1, 2013 – July 31, 2014 | $25,925.00 | $2,160.42 |
| August 1, 2014 – July 31, 2015 | $26,702.76 | $2,225.23 |
| August 1, 2015 – September 30, 2016 | $27,503.88 | $2,291.99 |

The Basic Rent for the third month shall be paid at the time of execution and delivery of this Lease. If this Lease shall commence on a date other than the first day of the month, the rent for such month shall be pro-rated and shall be paid by Tenant on the date this Lease commences. Notwithstanding anything to the contrary stated herein, the Landlord agrees that the Basic Rent shall be abated in full for the first two (2) months of the term of this Lease.

(b) All payments of Basic Rent, additional rent (as hereinafter provided) and other payments to Landlord required hereunder shall be made without demand, deduction or offset, in cash or by check payable to Landlord and shall be delivered to Donohoe Real Estate Services, Inc. (hereinafter called "Agent"), as Agent for Landlord, at its offices at 2101 Wisconsin Ave, NW, Washington, DC 20007, or to such other party and place as may be designated by notice in writing from Landlord to Tenant from time to time.

(c) Any monthly installment of Basic Rent not paid by the fifth day of the month shall be subject to a late charge of five percent (5%), but this does not extend the due date of the rent from the first day of each month. In addition, all Basic Rent not paid within thirty (30) days after the due date and all other rent and all other payments becoming due hereunder (including additional rent) shall bear interest at the rate of twelve percent (12%) per annum from the date when the same shall become due and payable.

(d) Tenant agrees to pay within five (5) days after demand a charge of Fifty Dollars ($50.00) for any check delivered by Tenant to Landlord (or its agent) which shall be dishonored by Tenant's bank. If more than two (2) checks shall be dishonored in any twelve (12) month period, Landlord shall have the right to require that all payments made by Tenant thereafter under this Lease shall be made by bank cashier's check, certified check, or money order.

(e) No payment by Tenant or receipt and acceptance by Landlord of a lesser amount than the Basic Rent, additional rent, or other payments to Landlord required hereunder shall be deemed to be other than part payment of the full amount then due and payable, nor shall any endorsement or statement on any check or any letter accompanying any check, payment of rent or other payment, be deemed an accord and satisfaction; and Landlord may accept such part payment without prejudice to Landlord's right to recover the balance due and payable or pursue any other remedy provided in this Lease.

2.2 [Intentionally Deleted.]

2.3 Real Estate Taxes.

(a) For the purposes of this Lease, the term "Real Estate Taxes" means all taxes, rates and assessments, general and special, levied or imposed with respect to the land, Building and improvements constructed thereon of which the Leased Premises are a part, including all taxes, rates and assessments, general and special, levied or imposed for school, public betterment, general or local improvements and taxes imposed in connection with any special taxing district. If the system of real estate taxation shall be altered or varied and any new tax or levy shall be levied or imposed on said land, Building and improvements, and/or on Landlord, in substitution for Real Estate Taxes presently levied or imposed on immovables in the jurisdiction where the property is located, then any such new tax or levy shall be included within the term "Real Estate Taxes".

(b) Tenant shall reimburse Landlord, in the manner provided in subsection (c) of this Section 2.3, as additional rent and in addition to Basic Rent and all other payments provided for herein, that portion of the Real Estate Taxes equal to the product obtained by multiplying such Real Estate Taxes by "Tenant's Percentage Share" as set forth in the next sentence. The term "Tenant's Percentage Share" for all purposes of this Section shall be 6.29% based on 48,461 square feet of rentable area in the Building.

(c) Tenant shall pay monthly, at the same time and place as the payment of Basic Rent, an amount equal to one-twelfth (1/12) of the actual or Landlord's estimate of Tenant's Percentage Share of the annual Real Estate Taxes. The first such installment shall be due on the commencement date of this Lease. Any overpayment of Tenant's Percentage Share of the Real Estate Taxes for any tax fiscal year shall be credited to rent thereafter due and payable (or refunded to Tenant at the expiration of this Lease) and on the due date of Insurance Costs, any balance of Tenant's Percentage Share not covered by the accumulation of monthly deposits shall be paid by Tenant within fifteen (15) days after Landlord's written demand. Landlord shall not be required to keep said escrow deposits separate from its general accounts and any interest earned on said escrow deposits shall be and remain the property of Landlord.

(d) Reasonable expenses, including attorneys' fees, expert witness fees and similar costs, incurred by Landlord in obtaining or attempting to obtain a reduction of any Real Estate Taxes and Landlord's administrative expenses relating to the foregoing shall be added to and included in the amount of any such Real Estate Taxes. Real Estate Taxes which are being contested by Landlord shall nevertheless be included for purposes of the computation of the liability of Tenant under this Section, provided, however, that in the event that Tenant shall have paid any amount of increased rent pursuant to this Section and Landlord shall thereafter receive a refund of any portion of any Real Estate Taxes on which such payment shall have been based, Landlord shall pay to Tenant the appropriate portion of such refund. Landlord shall have no obligation to contest, object or litigate the levying or imposition of any Real Estate Taxes and may settle, compromise, consent to, waive or otherwise determine in its discretion any Real Estate Taxes without consent or approval of Tenant.

(e) Nothing contained in this Section shall be construed at any time to reduce the monthly installments of rent payable hereunder below the amounts stipulated in Sections 2.1 and 2.2 of this Lease.

(f) If the termination date of the Lease shall not coincide with the end of a real estate tax year, then in computing the amount payable under this Section for the period between the commencement of the applicable real estate tax year in question and the termination date of this Lease, Tenant's Percentage Share of the Real Estate Taxes for the applicable real estate tax year shall be equitably apportioned (on a per diem basis) so that Tenant shall pay only such portion of Real Estate Taxes as is attributable to the portion of such real estate tax year occurring during

the term of this Lease. Tenant's obligation to pay Real Estate Taxes under this Section for the final period of the Leases shall survive the expiration of the term of this Lease.

(g) A tax bill or true copy thereof, together with any explanatory statement of additional items or the area or property covered thereby, submitted by Landlord to Tenant shall be conclusive evidence of the amount of Real Estate Taxes assessed or levied, as well as of the items taxed. If any real property tax or assessment levied against the said land, Building or improvements or the rents reserved therefrom, shall be evidenced by improvement bonds or other bonds, or in any other form, which may be paid in annual installments, only the amount paid or payable in any real estate tax fiscal year shall be included as Real Estate Taxes for that real estate tax year for purposes of this Section 2.3.

2.4 Common Area Operating Costs.

(a) For the purposes of this Lease, Common Area Operating Costs means the sum of the following costs and charges incurred by Landlord for each calendar year or part thereof during the term of this Lease: (i) "Common Area Costs" (as hereafter defined); and (ii) repair and maintenance costs (but not including any capital improvements or replacements) for the structure and exterior of the Building. Common Area Costs means all costs incurred by Landlord to operate, maintain, replace and repair the Common Areas, including but not limited to costs for the following: security services; gardening, grass cutting and landscaping; repairs; painting; striping and sweeping; lighting (including the cost of electricity and maintenance and replacement of fixtures and bulbs); refuse removal; ice and snow removal; equipment and supplies; recycling; replacement of paving, curbs and walkways; patching of parking surface; re-painting and re-striping of parking areas and car stops; a reserve for re-surfacing the parking lot [calculated on a ten (10) year life]; water and maintenance charges for sprinklers and hydrants; utilities not charged to separate tenants; management fees; and personnel to operate, maintain and repair the Common Areas (including salaries, employment taxes, fringe benefits and workmen's compensation insurance for such personnel).

(b) Landlord shall annually notify Tenant of Landlord's estimate of Tenant's Percentage Share of Common Area Operating Costs for each calendar year. Tenant's Percentage Share of WWDC Industrial Park Building(s) "#1-8" is 1.15% based on 265,561 rentable square feet. Tenant may, upon reasonable notice, examine and copy Landlord's records at Landlord's office during ordinary business hours not more than once each year to verify the statement for the immediately preceding year, but such examination shall not excuse the timely payment of Tenant's Percentage Share of Common Area Operating Costs.

(c) Tenant shall pay monthly, at the same time and place as the payment of Basic Rent, an amount equal to one-twelfth (1/12) of Landlord's estimate of Tenant's Percentage Share of the annual Common Area Operating Costs. The first such installment shall be due on the commencement date of this Lease. Any overpayment of Tenant's Percentage Share of the Common Area Operating Costs for any Lease year shall be credited to rent thereafter due and payable (or refunded to Tenant at the expiration of this Lease) and on the due date of Common Area Operating Costs, any balance of Tenant's Percentage Share not covered by the accumulation of monthly deposits shall be paid by Tenant within fifteen (15) days after Landlord's written demand. Landlord shall not be required to keep said escrow deposits separate from its general accounts and any interest earned on said escrow deposits shall be and remain the property of Landlord.

(d) If the termination date of the Lease shall not coincide with the end of the calendar year, then in computing the amount payable under this Section for the period between the commencement of the applicable year in question and the termination date of this Lease, Tenant's Percentage Share of the Common Area Operating Costs for the applicable year shall be equitably apportioned (on a per diem basis) so that Tenant shall pay only such portion of Common Area Operating Costs as is attributable to the portion of such year occurring during the term of this Lease. Tenant's obligation to pay Common Area Operating Costs under this Section for the final period of the Lease shall survive the expiration of the term of this Lease.

2.5 Insurance Costs.

(a) For the purposes of this Lease, "Insurance Costs" means all insurance premiums and other costs incurred by Landlord in connection with fire and extended coverage, public liability, business interruption, and any other insurance maintained by Landlord relating to the Building and the adjacent land owned by Landlord.

(b) Landlord shall annually notify Tenant of Landlord's estimate of Tenant's Percentage Share of Insurance Costs. Tenant's Percentage Share of WWDC Industrial Park Building "5" is 6.29% based on 48,461 rentable square feet. Tenant may, upon reasonable notice, examine and copy Landlord's records at Landlord's office during ordinary business hours not more than once each year to verify the statement for the immediately preceding year, but such examination shall not excuse the timely payment of Tenant's Percentage Share of Insurance Costs.

(c) Tenant shall pay monthly, at the same time and place as the payment of Basic Rent, an amount equal to one-twelfth (1/12) of Landlord's estimate of Tenant's Percentage Share of the annual Insurance Costs. The first such installment shall be due on the commencement date of this Lease. Any overpayment of Tenant's Percentage Share of the Insurance Costs for any year shall be credited to rent thereafter due and payable (or refunded to Tenant at the expiration of this Lease) and on the due date of Insurance Costs, any balance of Tenant's Percentage Share not covered by the accumulation of monthly deposits shall be paid by Tenant within fifteen (15) days after Landlord's written demand. Landlord shall not be required to keep said escrow deposits separate from its general accounts and any interest earned on said escrow deposits shall be and remain the property of Landlord.

(d) If the termination date of the Lease shall not coincide with the end of the year for which Insurance Costs have been billed, then in computing the amount payable under this Section for the period between the commencement of the applicable year in question and the termination date of this Lease, Tenant's Percentage Share of the Insurance Costs for the applicable year shall be equitably apportioned (on a per diem basis) so that Tenant shall pay only such portion of Insurance Costs as is attributable to the portion of such year occurring during the term of this Lease. Tenant's obligation to pay Insurance Costs under this Section for the final period of the Lease shall survive the expiration of the term of this Lease.

2.6 Gross Receipts Taxes.

After notification by Landlord, Tenant shall pay to Landlord, as additional rent together with each monthly payment of Basic Rent, an amount equal to any taxes (other than income taxes) levied or imposed upon the rentals payment under this Lease, whether described as gross receipts taxes, excise tax, or by any other term.

2.7 Additional Rental.

All amounts payable by Tenant under the terms of this Lease in addition to the Basic Rent and any charge or expense on behalf of Tenant under the terms of this Lease incurred by Landlord shall be considered additional rent hereunder. In addition to and not in limitation of any other rights and remedies which Landlord may have in case of the failure by Tenant to pay such sums when due, such nonpayment shall entitle Landlord to the remedies available to it hereunder for non-payment of rent. All such charges or expenses shall be paid to Landlord at Agent's office or to its successor or at such other place and to such other person as Landlord may from time to time designate in writing.

## ARTICLE III
## USE AND OCCUPANCY

3.1 Use of Premises.

(a) Tenant covenants to use and occupy the Leased Premises for administrative offices and for the storage, repackaging, and distribution of diapers, and for no other purpose whatsoever other than those to which Landlord may subsequently agree to in writing. Tenant shall operate the Leased Premises in the name of DC Diaper Bank and under no other name or trade name unless approved in writing by Landlord.

(b) Tenant will obtain and comply with all requirements of any and all permits, licenses, occupancy permits and the like, required to permit Tenant to occupy the Leased Premises, all at Tenant's sole expense.

(c) Tenant will not use or permit the Leased Premises or any part thereof to be used for any disorderly, unlawful or extra hazardous purpose nor for any other purpose than hereinbefore specified; and will not manufacture any commodity therein, without the prior written consent of Landlord; nor will Tenant permit any hazardous waste, toxic substance or other regulated substance to be placed upon or about the Leased Premises. Nor shall Tenant use or permit the use of the Leased Premises or any part thereof for any purpose which would adversely affect the then value thereof.

(d) Tenant shall not load the Leased Premises hereby leased beyond its present carrying capacity. Any damage resulting from overloading the floors or walls of the Leased Premises will be charged to Tenant.

(e) Tenant will not do or permit to be done in the Leased Premises, or the Building, or bring or keep anything therein, which shall in any way increase (or result in a rate higher than the standard minimum rate for normal warehouse use) the rate of fire or other insurance on the Building, or on the property kept in the Building. Nor will Tenant obstruct, or interfere with the rights of other tenants, or in any way, injure or annoy them, or those having business with them, or conflict with them, or conflict with the fire laws or regulations or with any insurance policy upon the Building or any part thereof, or with any statutes, rules or regulations enacted or established by the Federal Government or by the State, City or County in which the Leased Premises is located. If any increase in the rate of fire insurance or other insurance is stated by any insurance company due to the use of the Leased Premises by Tenant or the placement of any property (including but not limited to equipment) by Tenant in or about the Leased Premises, such statement shall be conclusive evidence that the increase in such rate is due to such use or property and, as a result thereof, Tenant shall be liable for such increase and shall reimburse Landlord therefor as additional rental.

(f) Tenant shall have only a non-exclusive right to use the common or public areas of the Building or the parking area on the land and shall not place or leave any items therein or thereon or in any other place on the land or in the Building other than within the Leased Premises. Landlord shall have the right at any time, without Tenant's consent, to change the arrangement or location of entrances, passageways, doorways, corridors, stairs, toilet rooms, or other public portions of the Building, provided that any such change does not unreasonably obstruct access to the Leased Premises.

3.2 Tenant Requirements for Space Improvement.

Landlord, at its sole cost and expense, shall provide the following tenant improvements to the Leased Premises:

1. Furnish and install one (1) demising wall;
2. Furnish and install up to 300 square feet of heated and air-conditioned, building standard office space at the front of the Leased Premises;
3. Warrant that the roll-up door is operating correctly and that all roll-up door gaskets are in place and in good operating condition.

3.3 Zoning and Permits.

Anything herein elsewhere contained to the contrary, this Lease and all the terms, covenants, and conditions hereof are in all respects subject and subordinate to all zoning restrictions affecting the Leased Premises, and the Building, and the Tenant agrees to be bound by such restrictions. The Landlord further does not warrant that any license or licenses, permit or permits, which may be required for the business to be conducted by the Tenant on the Leased Premises will be granted, or, if granted, will be continued in effect or renewed and any failure to obtain such license or licenses, permit or permits, or any revocation thereof or failure to renew the same, shall not release the Tenant from the terms of this lease.

3.4 Alterations.

(a) Tenant will not make any alterations, installations (including but not limited to heating and air conditioning equipment, screens and fences), changes, replacements, additions, or improvements, structural or otherwise, in or to the Leased Premises or any part thereof, without the prior written consent of Landlord. Tenant will make, at its expense:

(i) such alterations, modifications and improvements to the Leased Premises as may be required by the building or other applicable regulations in the jurisdiction in which the Leased Premises are located, or by Landlord's insurance carrier to avoid cancellation of Landlord's insurance, or to secure adequate additional insurance coverage, unless such alterations, modifications and improvements would be required without reference to the use being made of the Leased Premises, and

(ii) such alterations, modifications or improvements to the Leased Premises as may be required for the safety and health of Tenant's employees, pursuant to the Williams-Steiger Occupational Safety and Health Act of 1970 (OSHA), as the same may be amended or implemented from time to time;

but no such alterations, modifications or improvements nor any other alteration, modification, addition, installation or improvement Tenant may wish to make shall be made unless Landlord shall first have given written approval of the plans and specifications therefor, and Landlord shall have been protected, to Landlord's satisfaction, against any cost or damage incident thereto, and unless Tenant shall first have secured all necessary building and other permits. If Tenant should make any thereof without Landlord's consent, Tenant hereby agrees to indemnify Landlord from any liability which may devolve upon Landlord as a consequence thereof.

(b) Except for certain shelving to be installed and removed by the Tenant in accordance with this subsection, all alterations, installations, changes, replacements, additions to or improvements upon the Leased Premises (whether with or without Landlord's consent) shall, at the election of Landlord, remain upon the Leased Premises and be surrendered with the Leased Premises at the expiration of this Lease without disturbance, molestation or injury. Should Landlord elect that alterations, installations, changes, replacements, additions to or improvements upon the Leased Premises be removed upon termination of this Lease or upon termination of any renewal period hereof, Tenant hereby agrees to cause them (including the shelving described above) to be removed at Tenant's sole cost and expense and to repair any damage caused by such removal and should Tenant fail to remove them then and in such event Landlord shall cause them to be removed at Tenant's expense and Tenant hereby agrees to reimburse Landlord for the cost of such removal together with any and all damages which Landlord may suffer and sustain by reason of Tenant's failure to remove them.

3.5 Compliance with Laws, Ordinances, Etc.

Throughout the term of this Lease, Tenant, at its sole cost, will promptly comply with all present and future laws, ordinances, orders, rules, regulations and requirements of all federal, state and municipal governments, departments, commissions, boards and officers, and all orders, rules and regulations of the National Board of Fire Underwriters or any other body exercising similar functions, foreseen or unforeseen, ordinary as well as extraordinary, which may be applicable to the Leased Premises or to the use or manner of use of the Leased Premises whether or not such law, ordinance, rule, regulation or requirement shall necessitate structural changes or improvements or interfere with the use and enjoyment of the Leased Premises. If governmental regulations require recycling of any or all of the trash generated in the Leased Premises, Tenant agrees to participate in any recycling program and to assume any obligation for recycling which may be imposed upon Landlord, as the property owner, with respect to the refuse, garbage and trash generated by the Leased Premises' operation. Tenant shall likewise observe and comply with the requirements of all policies of public liability, fire and all other insurance at any time in force with respect to the Leased Premises.

3.6 Hazardous Waste.

(a) Tenant will not use, generate, manufacture, produce, store, release, discharge, or dispose of on, under or about the Leased Premises or transport to or from the Leased Premises any Hazardous Substance (as defined below) or allow any other person or entity to do so.

(b) Tenant shall keep and maintain the Leased Premises in compliance with, and shall not cause or permit the Leased Premises to be in violation of, any Environmental Law (as defined below).

(c) Tenant shall give prompt written notice to Landlord of:

(i) any proceeding or inquiry by any governmental authority with respect to the presence of any Hazardous Substance on the Leased Premises or the migration thereof from or to other property;

(ii) all claims made or threatened by any third party against Tenant or the Leased Premises relating to any loss or injury resulting from any Hazardous Substance; and

(iii) Tenant's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Leased Premises that could cause the Leased Premises or any part thereof to be subject to the restrictions on the ownership, occupancy, transferability or use of the Leased Premises under any Environmental Law.

(d) Landlord shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated with respect to the Leased Premises in connection with any Environmental Law and have its attorney fees in connection therewith paid by Tenant.

(e) Tenant shall protect, indemnify and hold harmless Landlord, its directors, officers, employees, agents, successors and assigns from and against any and all loss, damage, cost, expense or liability (including attorney fees and costs) directly or indirectly arising out of or attributable to the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal, or presence of a Hazardous Substance on, under or about the Leased Premises including without limitation (i) all foreseeable consequential damages, and (ii) the costs of any required or necessary repair, cleanup or detoxification of the Leased Premises and the preparation and implementation of any closure, remedial or other required plans. The foregoing environmental indemnity shall survive the expiration or termination of this Lease and/or any transfer of all or any portion of the Premises, or of any interest in this Lease, and shall be governed by the laws of the state in which the Leased Premises are located.

(f) In the event that any investigation, site monitoring, containment, cleanup, removal, restoration or other remedial work of any kind or nature (the "Remedial Work") is reasonable, necessary or desirable under any applicable local, state or federal law or regulation, any judicial order, or by any governmental or non-governmental entity or person because of, or in connection with, the current or future presence, suspected presence, release or suspected release of a Hazardous Substance in or into the air, soil, ground water, surface water or soil vapor at, on, about, under or within the Leased Premises (or any portion hereof), Tenant shall within thirty (30) days after written demand for performance thereof by Landlord (or such shorter period of time as may be required under any applicable law, regulation, order or agreement), commence and thereafter diligently prosecute to completion, all such Remedial Work. All Remedial Work shall be performed by contractors approved in advance by Landlord, and under the supervision of a consulting engineer approved by Landlord. All costs and expenses of such Remedial Work shall be paid by Tenant including, without limitation, Landlord's reasonable attorney fees and costs incurred in connection with monitoring or review of such Remedial Work. In the event Tenant shall fail to timely commence, or cause to be commenced, or fail to diligently prosecute to completion, such Remedial Work, Landlord may, but shall not be required to, cause such Remedial Work to be performed and all costs and expenses thereof, or incurred in connection therewith, shall become immediately due and payable as additional rent to the Landlord from the Tenant.

(g) "Environmental Law" means any federal, state or local law, statute, ordinance, or regulation pertaining to health, industrial hygiene, or the environmental conditions on, under or about the Leased Premises, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") as amended, 42 U.S.C. Sections 9601 et seq., and the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. Sections 6901 et seq.

(h) The term "Hazardous Substance" includes without limitation:

(i) Those substances included within the definitions of "hazardous substances," or "solid waste" in CERCLA, RCRA, and the Hazardous Materials Transportation Act, 49 U.S.C. Sections 1801 et seq., and in the regulations promulgated pursuant to said laws;

(ii) Those substances listed in the United States Department of Transportation Table (49 CFR 172.101 and amendments thereto) or by the Environmental Protection Agency (or any successor agency) as hazardous substances (40 CFR Part 302 and amendments thereto);

(iii) Such other substances, materials and wastes which are or become regulated under applicable local, state or federal law, or the United States government, or which are classified as hazardous or toxic under federal, state, or local laws or regulations; and

(iv) Any material, waste or substance which is (a) asbestos, (b) polychlorinated biphenyls, (c) designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act, 33 U.S.C. Sections 1251 et seq. (33 U.S.C. Section 1321) or listed pursuant to Section 307 of the Clean Water Act (33 U.S.C. Section 1317); (d) explosives, or (e) radioactive materials.

3.7 Fixtures, Etc.

Tenant covenants, at the expiration or other termination of this Lease, to remove all goods and effects from the Leased Premises not the property of the Landlord, and to yield to the Landlord the Leased Premises and all keys, locks and other fixtures connected therewith (except trade fixtures and other fixtures belonging to the Tenant), in good repair, order and condition in all respects, reasonable wear and use thereof and damage by fire or other casualty and damage from any risk with respect to which Tenant is not herein expressly made liable excepted.

3.8 Signs, Weight, Moving, Etc.

(a) Tenant agrees that no sign, advertisement or notice shall be inscribed, painted or affixed on any part of the outside or inside of the Leased Premises of the Building without the prior written approval of the Landlord.

(b) Tenant agrees that Landlord shall have the right to prescribe the weight, and method of installation and position of safes or other heavy fixtures or equipment; that all damage done to the Building by taking in or removing a safe or any other article of Tenant's equipment, or due to its being in the Leased Premises, shall be repaired at the expense of the Tenant.

(c) Tenant agrees not to strip or overload, damage or deface the Leased Premises or hallways, stairways, elevators, parking facilities or other approaches thereto, of the Building, or the fixtures therein or used therewith, nor to permit any hole to be made in any of the same. If Tenant does (or permits to be done) any of the foregoing, Tenant agrees to promptly make any repairs or replacements needed as a result thereof, after notice from Landlord.

3.9 Utilities.

Tenant agrees to pay all bills for electricity, gas, fuel, power, water, sewer use, trash removal, telephone, and all other utilities as the same become due. In the event the consumption of water is measured by one water meter for multiple tenants in the said building, each tenant shall pay his proportionate share of the water bill for the entire building promptly after being billed therefor by Landlord. If Tenant uses a proportion of water metered by a single meter greater than the proportion of the space leased by Tenant of the space leased by all tenants consuming water from that meter, Tenant will pay Landlord an amount sufficient to cover Tenant's additional water use promptly after being billed therefor by Landlord.

Tenant will repair all leaks of water lines, pipes and faucets within the premises leased by Tenant. Tenant shall not be permitted to use the water and sewer facilities for any purposes other than for the existing toilet facilities without Landlord's prior written consent. Tenant will not waste any water and will follow good water conservation practices.

3.10 Access.

Tenant agrees that it will allow Landlord, its agents or employees, to enter the Leased Premises at all reasonable times to examine, inspect or to protect the Leased Premises or prevent damage or injury to the Leased Premises, or to make such alterations and repairs as Landlord may deem necessary, or to exhibit the same to prospective tenants during the last six (6) months of the term of this Lease or to prospective purchasers at any time and during the last sixty (60) days of the term of this Lease, to exhibit on or about the Leased Premises signs or notices as to the availability of the Leased Premises for lease. Except in the event of an emergency, Landlord agrees that when feasible, it will make best efforts to provide reasonable advance notice to Tenant when Landlord intends to enter the Leased Premises.

3.11 Rules and Regulations.

Tenant covenants that the following rules and regulations, and such other and further rules and regulations as Landlord may make and which in Landlord's judgment are needful for the general well being, safety, care and cleanliness of the Leased Premises and Building, together with their appurtenances, shall be faithfully kept, observed and performed by Tenant, and by its agent, servants, employees and guests unless waived in writing by Landlord.

(a) Sidewalks, entries, passages, elevators and staircases and other parts of the Building which are not part of the Leased Premises shall not be obstructed or used for any other purposes than ingress or egress.

(b) Tenant shall not store any material, supplies, semi-finished products, pipes, equipment, wooden pallets, vehicles disabled or being repaired (or vehicles of any kind for more than one week), trailers, vans or anything whatsoever outside of the Building. If any such items are not removed within forty-eight (48) hours (one week for vehicles not disabled or being repaired) Landlord shall have the right to remove the same, without notice to Tenant, and with no responsibility to Landlord for loss or damage to such items, and the cost to Landlord of such removal shall be deemed to be additional rent under the Lease and will be immediately paid by Tenant to Landlord upon demand.

(c) All trash storage must be confined to the Building's interior or in the outside areas in the rear of the Building or other areas designated by Landlord. All outside storage of trash is to be in containers furnished by Tenants and subject to approval by Landlord. Tight lids shall be kept on all trash containers and no trash shall be permitted to spill over from such containers.

(d) Tenant shall not install or permit the installation of any awnings, shades and the like other than those approved by Landlord in writing.

(e) Tenant will keep the Leased Premises and approaches thereto clean and free from rubbish and will not perform any acts or carry on any practices which may damage the Leased Premises or the Building or be a nuisance or menace to other tenants.

(f) No additional locks shall be placed upon any doors of the Leased Premises; and doors leading to the corridors or main halls shall be kept closed during business hours except as they may be used for ingress or egress. Tenant agrees to promptly furnish Landlord a duplicate(s) of any keys for locks Tenant may place upon any such doors.

(g) Tenant shall not construct, maintain, use or operate within the Leased Premises or elsewhere in the Building or on the outside of the Building, any electrical device, wiring or apparatus in connection with a loud speaker system or other sound system unless Tenant shall have first obtained the prior written consent of Landlord.

(h) Should the Tenant, its agent or invitees, activate the sprinkler system, Tenant agrees that it will pay, as additional rent to Landlord, the full cost of draining and resetting the system and of any damage to the Building and to property of other tenants.

(i) No cooking shall be done or permitted by Tenant in the Leased Premises, without the prior written consent of Landlord, provided, however, that the heating, refrigerating and preparing of beverages and light snacks shall be permitted if there are appropriate facilities and equipment for such purpose and subject to the prior written consent of Landlord. Tenant shall not cause or permit any unusual or objectionable odors to be produced upon or emanate from the Leased Premises.

(j) Tenant shall not operate any machinery in the Leased Premises which may cause damage to the Leased Premises, vibration deemed by the Landlord to be excessive, or noise which may be transmitted beyond the confines of the Leased Premises; nor shall Tenant install any equipment or fixtures which cause any damage to the Building or damage or annoyance to other tenants.

(k) Tenant shall not overload the floor or electrical wiring and not install any additional electrical wiring or plumbing without Landlord's prior written consent.

(l) Tenant shall not conduct, permit, or suffer any public or private auction sale to be conducted on or from the Leased Premises.

(m) No animals of any kind, except canine service animals, shall be brought into or kept about the Building by Tenant or any of its employees, agents or guests.

(n) No vending machines shall be permitted to be placed or installed in any part of the Building by any tenant. Landlord reserves the right to place or install vending machines in any part of the common areas of the Building.

(o) Tenant will not wash any vehicles on or about the Building or the premises upon which the Building is located.

(p) Tenant, during the Lease Term, will not park more than five (5) vehicles at WWDC Industrial Park at any time during business hours between 8:00 AM and 6:00 PM, Monday through Friday excluding federal holidays. During other times outside of such business hours, Tenant and its guests will not park more than fifteen (15) vehicles at WWDC Industrial Park, If Tenant should violate these provisions, the Landlord, at its sole discretion, and without notice to Tenant, may tow away said vehicles at Tenant's sole cost and expense

3.12 Relocation of Tenant.

Landlord shall have the right from time to time during the term of this Lease to relocate the Leased Premises from their present location within the Building to another location within the Building having at least the same floor area as that of the Leased Premises, provided that the Landlord gives the Tenant written notice of the Landlord's intention to do so at least sixty (60) days before undertaking such relocation. The Landlord shall, at its expense, finish out the new location in a manner comparable to that in the Leased Premises and shall pay all reasonable moving costs incurred by the Tenant in connection with such move. Upon the completion of such relocation, this Lease shall automatically cease to cover the space constituting the Leased Premises immediately before such relocation, and shall automatically thereafter cover the space to which the Leased Premises have been relocated, as aforesaid, all on the same terms and subject to the same conditions as those set forth in the provisions of this Lease as in effect immediately before such relocation, and all without the necessity of further action by either party hereto; provided, that each party hereto shall, promptly upon its receipt of a written request therefor from the other, enter into such amendment of this Lease as the requesting party considers reasonably necessary to confirm

such relocation. Should the Tenant refuse to permit the Landlord to move the Tenant, the Landlord, in addition to any other remedies it may have by reason thereof, shall have the right to cancel and terminate this Lease by giving ten (10) days' prior notice to the Tenant.

3.13 Subletting and Assignment.

(a) Tenant will not sublet the Leased Premises or any part thereof, including desk space, or transfer possession or occupancy thereof, to any person, firm or corporation or transfer, assign, mortgage or encumber this Lease or any interest in this Lease or permit the transfer of any of its corporate stock, without the prior written consent of Landlord, nor shall any subletting, assignment or transfer hereof be effected by operation of law or otherwise without the prior written consent of Landlord. Landlord's consent may be withheld in its sole and absolute subjective discretion. Any attempted subletting, assignment, transfer, mortgaging or encumbering of this Lease in violation of the provisions hereof shall be void and confer no rights on any third person.

(b) If Tenant desires to sublet all or a substantial portion of the Leased Premises, Tenant shall give Landlord thirty (30) days written notice of Tenant's intention to do so, together with a written statement containing the name of the proposed assignee or subtenant, such information as to its financial responsibility and standing as Landlord may require, and all of the terms and provisions upon which the proposed assignment or subletting is to be made and, if the proposed sublet area constitutes less than all of the Leased Premises, a floor plan designating the proposed sublet area. Tenant shall reimburse Landlord, upon demand, any reasonable out-of-pocket costs (including attorney's fees) incurred by Landlord in reviewing the proposed assignment or sublease. Tenant's liability for these fees shall not exceed One Thousand Dollars ($1,000). Within fifteen (15) business days after receipt of said notice, Landlord shall have the right to sublet the Leased Premises from Tenant at the same rental stipulated herein. If Tenant desires to sublet all of the Leased Premises, Landlord shall have the right to terminate this Lease on a date to be agreed upon by Landlord and Tenant. If Landlord has not exercised its right to sublet the Leased Premises or terminate this Lease as heretofore provided, Tenant may sublet the Leased Premises only after first obtaining the prior written consent of Landlord.

(c) If Tenant shall receive any consideration for any assignment or the rent provided under any sublease shall be greater than the rent provided for herein, Tenant shall pay to Landlord an additional rental equal to one-half of all such increased amounts on the date which such rentals are due under the assignment or sublease.

(d) If Landlord consents to the subletting or assignment of the Leased Premises, Tenant shall remain fully liable and obligated under all the terms, conditions and provisions of this Lease and any assignee shall assume all of the obligations of the Tenant under this Lease. The consent by Landlord to any assignment, transfer, or subletting to any party other than Landlord, shall not be constructed as a waiver or release of Tenant from the terms of any covenants or obligation under this Lease, nor shall the collection or acceptance of rent from any such assignee, transferee, subtenant or occupant constitute a waiver of, or release of Tenant from, the terms of any covenant or obligation contained in this Lease, nor shall any such assignment or subletting be construed to relieve Tenant from giving Landlord said thirty (30) day notice or from obtaining the consent in writing of Landlord to any further assignment or subletting. In the event that Tenant defaults hereunder, Tenant hereby assigns to Landlord the rent due from any subtenant of Tenant and hereby authorizes each such subtenant to pay said rent directly to Landlord. A copy of the assignment or sublease will be furnished to Landlord prior to its approval and will not thereafter be modified or amended without Landlord's prior consent.

3.14 Elements of Constructive Eviction.

Tenant shall not be entitled to claim a constructive eviction from the Leased Premises unless Tenant shall have first notified Landlord in writing of the condition giving rise to the claim and, if the complaints are justified, unless Landlord fails to remedy the conditions within a reasonable time after receipt of the notice.

## ARTICLE IV
## MAINTENANCE & REPAIRS

4.1 Repairs by Landlord.

Subject to reasons beyond its control, Landlord agrees, at its expense, to maintain and keep in repair the structural parts of the Leased Premises. Landlord shall not be liable to make any other improvements or repairs of any kind to the Leased Premises. Except as provided in this section, Landlord shall not be required to furnish any services or facilities or to make any repairs, alterations or improvements in or to the Leased Premises. Tenant shall notify Landlord in writing of the need for any repairs which Landlord is required to make under this Section. There shall be no allowance to Tenant for a diminution of rental value and no liability on the part of Landlord by reason of inconvenience, annoyance or injury to business arising from the making of any repairs in or to any portion of the Leased Premises or the Building (or in or to fixtures, appurtenances or equipment thereof).

4.2 Repairs by Tenant.

Except as aforesaid in Section 4.1 hereof, Tenant hereby assumes the full and sole responsibility for the condition, operation, repair, replacement, maintenance and management of the Leased Premises. Tenant, at its expense, shall at all times maintain the Leased Premises in good condition and repair, including all mechanical, plumbing, heating, air conditioning, sprinkling and electrical equipment (and make replacements of such equipment where needed, including interior and exterior lighting fixtures and bulbs) and all other non-structural parts of the Leased Premises and shall keep the Leased Premises in a clean, sanitary, and safe condition in accordance with all

directions, rules and regulations of the health officer, fire marshal, building inspector or other proper officers of the governmental agencies having jurisdiction. Tenant shall clean its premises and remove all trash therefrom daily or at a reasonable frequency such that there is never noticeable trash on the premises. Tenant shall comply with all requirements of law, ordinances, and otherwise, affecting the Leased Premises; and shall permit no waste, damage or injury to said premises. Tenant shall enter into service contracts for the maintenance of the heating system, as well as the air conditioning and sprinkling systems. Tenant must correct any deficiencies noted on any inspection report with respect to the Leased Premises, within thirty (30) days after receiving notice to do so from Landlord.

All such repairs, restorations and replacements shall conform to the standards of the Building and all contracts and subcontracts, contractors, subcontractors and suppliers involved in such work shall be subject to the approval of Landlord, whose written approval shall be obtained prior to the commencement of any such work. If Tenant shall fail to make such repairs, restorations or replacements, then Landlord shall have the right to make such necessary repairs, restorations and replacements, structural, non-structural, or otherwise, and any charge or cost so incurred by Landlord shall be paid by Tenant to Landlord as additional rent payable with the installment of rent next becoming due under the terms of this Lease. This provision shall be construed as an additional remedy granted to Landlord and not in limitation of any other rights and remedies which Landlord has or may have in said circumstances.

## ARTICLE V
## INSURANCE, DAMAGES AND CONDEMNATION

5.1 Insurance and Indemnification.

(a) Tenant agrees to save Landlord and Agent harmless and indemnified from all loss, damage, liability or expense incurred, suffered, or claimed by any person whomsoever by reason of Tenant's negligent acts or omissions in use of the Leased Premises or of the Building or of anything thereon, or the parking facilities in or adjacent thereto, or of water, steam, electricity, or other agency, or by reason of any injury, loss, or damage to any person or property upon the Leased Premises, the Building or parking facilities, and to be answerable for all nuisances caused or suffered on the Leased Premises, or caused by Tenant in the Building, or parking facilities, or on the approaches thereto.

(b) Tenant shall at all times during the term hereof keep in force at its own expense non-deductible:

(i) commercial (comprehensive) liability insurance policy, including (but not limited to) insurance against assumed or contractual liability under this Lease, with respect to liability arising out of the ownership, use, occupancy or maintenance of the premises and all areas appurtenant thereto, to afford protection with respect to personal injury, death or property damage of not less than One Million Dollars ($1,000,000) per occurrence combined single limit, and Two Million Dollars ($2,000,000) general aggregate (but not less than $2,000,000 per location aggregate); and

(ii) all-risks property and casualty insurance policy, including theft coverage, written at replacement cost value and with replacement cost endorsement, covering all of Tenant's personal property in the Premises (including, without limitation, inventory, stock, trade fixtures, floor coverings, furniture and other property removable by Tenant under the provision of this Lease, all of which shall be on the Leased Premises at Tenant's sole risk) and all leasehold improvements installed in the Premises by or on behalf of Tenant; and

(iii) comprehensive boiler and machinery equipment policy, including electrical apparatus, if applicable; and

(iv) if and to the extent required by law, worker's compensation insurance policy, or similar insurance in form and amount required by law.

(c) Tenant shall require any contractor of Tenant performing work on the Premises to carry and maintain at no expense to Landlord, a non-deductible:

(i) commercial (comprehensive) liability insurance policy, including (but not limited to) contractor's liability coverage, contractual liability coverage, completed operations coverage, broad form property damage endorsement and contractor's protective liability coverage, to afford protection, with respect to personal injury, death or property damage of not less than One Million Dollars ($1,000,000) per occurrence combined single limit, and Two Million Dollars ($2,000,000) general aggregate (but not less than $2,000,000 per location aggregate); and

(ii) comprehensive automobile liability insurance policy with limits for each occurrence of not less than One Million Dollars ($1,000,000) with respect to personal injury or death and Five Hundred Thousand Dollars ($500,000) with respect to property damage; and

(iii) worker's compensation insurance policy or similar insurance in form and amounts required by law.

(d) Notwithstanding any other provisions contained in this Lease to the contrary, the company or companies writing any insurance which Tenant is required to carry and maintain or cause to be carried or maintained pursuant to this Lease, as well as the form of such insurance shall at all times be subject to Landlord's approval and any such company or companies shall be licensed to do business in the State in which the Leased Premises are

located. All companies must have a policyholders rating of at least A, with a financial rating of XII. Public liability and all-risk casualty insurance policies evidencing such insurance shall name Landlord or its designee as additional insured, shall be primary and non-contributory, and shall also contain a provision by which the insurer agrees that such policy shall not be cancelled except after thirty (30) days written notice to Landlord or its designee. Each such policy, or a certificate thereof, shall be deposited with Landlord by Tenant or promptly upon commencement of Tenant's obligation to procure the same. If Tenant shall fail to perform any of its obligations under this Article V, Landlord may perform the same and the cost of same shall be deemed additional rental and shall be payable upon Landlord's demand.

(e) Notwithstanding any other provisions contained in this Article V to the contrary, neither Landlord nor Tenant shall be liable to the other or to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage to any building, structure or other tangible property or loss of income deriving therefrom, or losses under Workmen's Compensation laws and benefits, even though such losses or damages might have been occasioned by the negligence of such party, its agents or employees. However, if by reason of the foregoing waiver, either party shall be unable to obtain any such insurance, such waiver shall be deemed not to have been made by such party.

5.2 Damage by Fire or Casualty.

(a) If the Leased Premises shall be destroyed or damaged, from whatsoever cause, so as to render them unfit for the purposes for which leased, and if it is reasonably possible to repair such destruction or damage within one hundred eighty (180) days, then Tenant shall not be entitled to surrender possession of the Leased Premises without the prior written consent of Landlord, but Landlord shall proceed to repair the destruction or damage with all reasonable speed and shall complete the same within one hundred eighty (180) days, unless there shall be less than one year remaining in the term of this Lease, in which event Landlord may elect to terminate the Lease in accordance with subsection (b) hereof. In such event, Tenant shall be granted a proportionate rebate and deduction from the rental payments made and to be made hereunder, for the period from the date of such damage or destruction until the Leased Premises are ready for occupancy by Tenant or until the termination of this Lease, corresponding to the portion of the Leased Premises with respect to which Tenant is deprived of normal occupancy and use.

(b) Anything contained in the foregoing provision of this Section to the contrary notwithstanding, if during the term of this Lease the Building is so damaged by fire or other casualty that (a) either the Leased Premises or (whether or not the Leased Premises are damaged) the Building are rendered substantially unfit for occupancy, as reasonably determined by the Landlord, or (b) the Building is damaged to the extent that the Landlord reasonably elects to demolish the Building, or if any Mortgagee requires that any or all of such insurance proceeds be used to retire any or all of the debt secured by its Mortgage, then in any such case the Landlord may elect to terminate this Lease as of the date of such casualty, by giving written notice thereof to the Tenant within thirty (30) days after such date; and in such event, (a) the Tenant shall pay to the Landlord the rent and any additional rent payable by the Tenant under this Lease and accrued through the date of such termination, (b) the Landlord shall repay to the Tenant any and all prepaid rent for periods beyond such termination, and (c) the Landlord may enter upon and repossess the Leased Premises without further notice.

(c) Tenant shall give immediate notice to Landlord in case of fire or other damage to the Leased Premises.

5.3 Other Damage.

(a) All injury to the Leased Premises or the Building, caused by moving property of Tenant into, in or out of, the Building and all breakage done by Tenant, or the agents, servants, employees, and visitors of Tenant shall be repaired by Tenant, at expense of Tenant. If Tenant shall fail to do so, then Landlord shall have the right to make such necessary repairs, alterations and replacements, structural, nonstructural or otherwise and any charge or cost so incurred by Landlord shall be paid by Tenant with the right on the part of Landlord to elect in its discretion to regard the same as additional rent, in which event such cost or charge shall become additional rent payable with the installment of rent next becoming due or thereafter falling due under the terms of this Lease. This provision shall be construed as an additional remedy granted to Landlord and not in limitation of any rights and remedies which Landlord has or may have in these circumstances.

(b) Landlord shall not be liable for any damage to any property, or person, at any time in the Leased Premises, or the Building, from fire, the perils of the standard extended coverage endorsement, explosion, steam, gases, or electricity, or from water, rain, or snow, whether they may leak into, issue or flow from, any part of the Building, or from the pipes, sprinkler system, or heating or air conditioning apparatus of the Building, or from any other place or from any other cause of any kind or nature whatsoever. Tenant shall give Landlord prompt notice of any accident to or defect in the pipes, sprinkler system, heating or air conditioning apparatus, or electric wires or system in order that it may be remedied by Landlord.

(c) Landlord assumes no liability or responsibility whatever with respect to the conduct and operation of the business to be conducted in the Leased Premises nor for any loss (including theft) or damage of whatsoever kind or by whomsoever or however caused, to personal property, documents, records, monies, or goods of Tenant or to anyone in or about the Leased Premises, and Tenant agrees to hold Landlord harmless against all such claims.

5.4 Condemnation.

Tenant agrees that if the Leased Premises, or any part thereof, shall be taken or condemned for public or quasi-public use or purpose by any competent authority, Tenant shall have no claim against Landlord and shall not have any claim or rights to any portion of the amount that may be awarded as damages or paid as a result of any such condemnation; and all rights of Tenant to damages therefor, if any, are hereby assigned by Tenant to Landlord. Upon such condemnation or taking, the term of this Lease shall cease and terminate from the date of such taking or condemnation, and Tenant shall have no claim against Landlord for the value of any unexpired term of this Lease, provided that if the Leased Premises are not taken, but the taking involves a portion of such land and/or Building, then the termination of this Lease shall be the election of Landlord.

ARTICLE VI
SURRENDER OF PREMISES

6.1 Surrender and Restoration.

Tenant agrees to remove from the Leased Premises, at the expiration or other termination of this Lease, all goods and effects not belonging to Landlord, and to surrender possession of the Leased Premises and all fixtures and furnishings connected therewith in good repair, order and condition in all respects, reasonable wear and use thereof and damage by fire or other unavoidable casualty only excepted. If Tenant shall fail to perform any of the foregoing obligations, Landlord is authorized to do so in Tenant's behalf and to sell such articles and effects left on the Leased Premises as may be saleable. The proceeds of any such sale shall be applied toward the expenses thus incurred, and Tenant agrees to pay any balance promptly.

6.2 Tenant Holding Over.

If Tenant shall not immediately surrender possession of the Leased Premises at the termination of this Lease, Tenant shall become a tenant from month to month, provided rent shall be paid to and accepted by Landlord, in advance, at double the rate of rent (including Basic Rent and pro-rated additional rent) payable hereunder just prior to the termination of this Lease; but unless and until Landlord shall accept such rental from Tenant, Landlord shall continue to be entitled to retake or recover possession of the Leased Premises as herein provided in case of default on the part of Tenant, and Tenant shall be liable to Landlord for any loss or damage (including both direct and consequential damages) Landlord may sustain by reason of Tenant's failure to surrender possession of the Leased Premises immediately upon the expiration of the term of this Lease. Tenant waives any notice to quit. All rights of Landlord applicable during the term of this Lease shall be equally applicable during such period of subsequent occupancy by Tenant, whether or not a month to month tenancy shall have been created as aforesaid.

6.3 Security Deposit.

Tenant simultaneously with the execution of this Lease shall deposit with Landlord the sum of Two Thousand One Hundred Sixty and 42/100 Dollars ($2,160.42) to be held as a security deposit to assure the prompt, full and faithful performance by Tenant of each and every provision of this Lease and of all obligations of Tenant hereunder. Landlord may apply the security deposit (which shall not bear interest to Tenant) or such portion thereof as is necessary, to the cost of repairing any damage to the Leased Premises caused by Tenant or Tenant's customers or employees or to defray any damage, loss or expense suffered by Landlord on account of any breach by Tenant of any of the terms or provisions thereof, at any time, including the non-payment of rent. In the event that Landlord applies all or any portion of the security deposit to cure such default or to defray any damage, loss or expense on account of any breach by Tenant, then Tenant shall be obligated to promptly deposit with Landlord the amount necessary to restore the security deposit to its original amount. If Tenant is in default under this Lease more than two (2) times within any twelve (12) month period, irrespective of whether or not such default is cured, then, without limiting Landlord's other rights and remedies provided for in this Lease or at law or equity, the Security Deposit shall automatically be increased by an amount equal to the greater of (a) three (3) times the original Security Deposit; or (b) three (3) months' Basic Rent, which shall be paid by Tenant to Landlord within ten (10) days after demand by Landlord. The amount of the security deposit which is not applied as aforesaid shall be refunded to Tenant after its surrender of occupancy of the Leased Premises provided Tenant is not in default under any provision hereof. The security deposit is not to be applied by Tenant as payment of any rent whatsoever. The Landlord will provide the Tenant with a list of the charges or costs, to which the security deposit is applied.

ARTICLE VII
DEFAULTS

7.1 Defaults and Remedies.

It is agreed that if

(a) Tenant shall fail to pay the rent or any installment thereof as aforesaid at the time and same shall become due and payable and/or any additional rent as herein provided although no demand shall have been made for the same; or

(b) Tenant shall violate or fail or neglect to keep and perform any of the covenants, conditions and agreements herein contained on the part of Tenant to be kept and performed; or

(c) the Leased Premises shall become vacant or deserted by Tenant, whether or not rent is in default; or

(d) there be any attachment, execution or other judicial seizure of all or a substantial part of the assets of Tenant or Tenant's leasehold; then, and in each and every event from thenceforth, and at all times thereafter, at the option of Landlord, Tenant's right of possession shall thereupon cease and terminate, and Landlord shall be entitled to possession of the Leased Premises and to re-enter the same without demand of rent or demand of possession of the Leased Premises and may forthwith proceed to recover possession of the Leased Premises by process of law, any notice to quit or of intention to re-enter the same being hereby expressly waived by Tenant. And, in event of such re-entry by process of law or otherwise, Tenant nevertheless agrees to remain answerable for any and all damage, deficiency or loss of rent which Landlord may sustain by such re-entry whether or not Landlord re-lets the Leased Premises; and in such case, Landlord shall have full power, which is hereby acceded to by Tenant, to re-let the Leased Premises for and on Tenant's behalf, and upon such re-letting Landlord shall have the right each month to sue for and recover any loss of rents or monthly deficits, with the right reserved by Landlord to bring any action(s) or proceeding(s) for the recovery of any deficits remaining unpaid without being obligated to await the end of the term of this Lease for a final determination of Tenant's account, and the commencement or maintenance of any one or more actions shall not bar Landlord from bringing other or subsequent actions for further accruals pursuant to provisions of this Section. Landlord shall also have the right to declare the entire balance of the rent for the remainder of the term of this Lease to be due and payable immediately, and collect such balance in any manner not inconsistent with applicable law; provided that if the Landlord elects to relet any or all of the Leased Premises following such acceleration of rent, the provisions of this Section shall be applicable with respect to the rights of the Landlord and the Tenant. Accelerated payments payable under this Lease shall not constitute a penalty or forfeiture or liquidated damages, but shall merely constitute payment of rent in advance.

If under the provisions of this Lease, a summons or other applicable summary process shall be served, pursuant to the law of the State in which the Leased Premises are located, and a compromise settlement thereof shall be made, it shall not be constituted as a waiver of any breach of any covenant, condition or agreement herein contained and no waiver of any breach of any covenant, condition or agreement herein contained shall operate as a waiver of the covenant, condition or agreement itself, or of any subsequent breach thereof. No provision of this Lease shall be deemed to have been waived by Landlord unless such waiver shall be in writing signed by Landlord. No payment by Tenant or receipt by Landlord of a lesser amount than the monthly installments of rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy provided in this Lease.

7.2 <u>Persistent Failure to Comply with Lease Requirements.</u>

In addition to any other remedies available to Landlord pursuant to this Lease or by law, Landlord may, at any time throughout the term of this Lease, terminate this Lease upon Tenant's default on three (3) separate occasions during any twelve (12) month period of any one or more provisions of this Lease, regardless of whether or not such subsequent defaults have been cured. Termination, pursuant to this Section 7.2, shall be effective upon Landlord's delivery to Tenant of a Notice of Termination.

7.3 <u>Bankruptcy.</u>

If at any time during the term of this Lease or any renewal, a petition shall be filed, either by or against Tenant, in any court pursuant to any Federal, State or municipal statute, whether in bankruptcy, insolvency, or for reorganization or for the appointment of a receiver or trustee of all or a portion of Tenant's property or if Tenant makes an assignment for the benefit of Tenant's creditors, then immediately upon the happening of any such event, and without any entry or other act by Landlord, this Lease, at Landlord's option, shall cease and come to an end with the same force and effect as if the date of the happening of any such event were the date herein fixed for the expiration of the term of this Lease.

It is stipulated and agreed that in the event of termination of this Lease by the happening of any such event, Landlord shall forthwith, upon such termination, and any other provisions of this Lease to the contrary notwithstanding, be entitled to recover from Tenant as and for liquidated damages caused by such breach of the provisions of this Lease an amount equal to the difference between the then cash value of the rent reserved hereunder for the unexpired portion of the term and the then cash rental value of the Leased Premises for the unexpired portion of the term of this Lease, unless the statute which governs or shall govern the proceeding in which the damages are to be proved limits or shall limit the amount of the claim capable of being so proved, in which case Landlord shall be entitled to prove as and for liquidated damages an amount equal to that allowed by or under any such statute. The provisions of this Section shall be without prejudice to Landlord's right to prove in full damages for rent accrued prior to termination of this Lease, but not paid and shall be without prejudice to any right given Landlord by any pertinent statute to prove further any amounts allowed thereby.

In making any such computation, the then cash rental value of the Leased Premises shall be deemed prima facie to be the rental realized upon any re-letting, if such re-letting can be accomplished by Landlord within a reasonable time after the termination of this Lease, and the then present cash value of the future rents hereunder reserved to Landlord for the unexpired portion of the term hereby demised shall be deemed to be such sum, if invested at eight percent (8%) simple interest, as will produce the future rent over the period of time in question.

7.4 Failure of Tenant to Perform.

If Tenant shall at any time fail to make any payment or perform any act on its part to be made or performed under the terms of this Lease, then Landlord may, but shall not be obligated so to do, and without notice to or demand upon the Tenant and without waiving or releasing Tenant from any obligation in this Lease, make any such payment or perform any such act on the part of Tenant to be made or performed as in this Lease provided. All sums so paid by Landlord and all necessary incidental costs and expenses in connection with the performance of any such act by Landlord, together with interest thereon at the rate of twelve percent (12%) per annum from the date of making of such expenditure, shall be deemed additional rent under this Lease and shall immediately become due and payable by Tenant to Landlord on demand.

7.5 Landlord's Security Interest.

In addition to any lien for rent available to the Landlord, the Landlord shall have, and the Tenant grants to the Landlord, a continuing security interest for all Basic Rent, additional rent and other sums of money becoming due under this Lease from the Tenant, upon all of the Tenant's accounts receivable, inventory, equipment, and all other personal property located on or about the Leased Premises, none of which may be removed therefrom without the Landlord's express, written consent so long as any Basic Rent, additional rent or other such sum from time to time owed to the Landlord under this Lease remains unpaid or another uncured event of default has occurred. On the occurrence of an event of default, the Landlord shall have, in addition to any other remedies provided in this Lease or by law, all of the rights and remedies afforded to secured parties under the provisions of the Uniform Commercial Code, as codified in the Commercial Law Article of the Annotated Code of Maryland (hereinafter referred to as "the Code"), including by way of example rather than of limitation (a) the right to sell the Tenant's said property at public or private sale upon ten (10) days' notice to the Tenant, and (b) the right to take possession of such property without resort to judicial process in accordance with the provisions of Section 9-503 of the Code. The Tenant shall, on its receipt of a written request therefor from the Landlord, execute such financing statements and other instruments as are necessary or desirable, in the Landlord's judgment, to perfect such security interest.

7.6 Landlord's Liability.

In no event shall Landlord, including any successor assignee of all or any portion of Landlord's interest in the Building, be personally liable or accountable with respect to any provision of this Lease. If Landlord shall be in breach or default with respect to any obligation hereunder or otherwise, Tenant agrees to look for satisfaction solely to the equity of Landlord in the Building. The liability of Landlord, or other entity comprising Landlord, shall in no event exceed the amount of such equity and no other assets of Landlord (or any partners, stockholders, or officers of Landlord) shall be subject to levy, execution or other procedures for the satisfaction of Tenant's remedies. In the event Landlord transfers this Lease, other than as security for a mortgage or deed of trust, Landlord (and, in case of any subsequent transfers or conveyance, the then grantor) shall, upon such transfer and acceptance by the transferee be relieved from all liability and obligations hereunder arising after such transfer, including any liability to Tenant for any security deposit under this Lease.

## ARTICLE VIII
## LANDLORD'S MORTGAGE

8.1 Subordination.

This Lease is subject and subordinate to all ground or underlying leases and to all mortgages and/or deeds of trust which may now or hereafter affect such leases or the real property of which the Leased Premises form a part, and to all renewals, modifications, consolidations, replacements and extensions thereof. This clause shall be self-operative. In confirmation of such subordination, Tenant shall execute promptly any certificate that Landlord may request. Notwithstanding the foregoing, the party secured by any such deed of trust or mortgage shall have the right to recognize this Lease, and in event of any foreclosure sale under such deed of trust or mortgage, this Lease shall continue in full force and effect at the option of the party secured by such deed of trust or mortgage or the purchaser under any such foreclosure sale; and Tenant covenants and agrees that it will, at the written request of any party secured by any such deed of trust, execute, acknowledge and deliver any instrument that has for its purpose and effect the subordination to said deed of trust or mortgage of the lien of this Lease. Tenant agrees that any mortgagee and/or deed of trust holder or any other purchaser or transferee of the Leased Premises by foreclosure or deed in lieu of foreclosure shall (a) not be liable for any defaults or actions of the Landlord occurring prior to mortgagee, deed of trust holder, purchaser or transferee acquiring the Leased Premises, and (b) not be personally liable under the Lease.

8.2 Tenant's Estoppel Certificate.

Within seven (7) days after written request therefor by Landlord, Tenant covenants and agrees to deliver to the beneficiary under any deed of trust, or the holder of any mortgage, against the Building or any prospective purchaser of the Building, upon the written request of Landlord or its designee, at any time and from time to time, a certificate stating whether (1) this Lease is still in full force and effect, (2) the Lease has been amended or modified, (3) all rent has been paid to date and if any rent has been unpaid, (4) Tenant or Landlord is in default under this Lease (and if any default exists, the nature of it), (5) Tenant has any claims against Landlord (and if any claim exists, the nature of it), (6) Tenant knows of any assignment of this Lease by Landlord, and (7) as to any other fact or condition reasonably requested by the Landlord or any mortgagee or beneficiary under any deed of trust or prospective mortgagee or beneficiary under any deed of trust, or purchaser of any or all of Landlord's interests, or any assignee or prospective assignee of any interest of Landlord under this Lease.

8.3 Limited Liability of Mortgagee.

Tenant agrees that any mortgagee and/or deed of trust holder or any other purchaser or transferee of the Leased Premises by foreclosure or deed in lieu of foreclosure shall (a) not be liable for any defaults or actions of the Landlord occurring prior to mortgagee, deed of trust holder, purchaser or transferee acquiring the Leased Premises, and (b) not be personally liable under the Lease.

8.4 Notice to Mortgagee.

Tenant agrees to give any mortgagee and/or deed of trust holder, a copy of any notice of default served upon the Landlord, provided that prior to such notice Tenant has been notified in writing (by way of Notice of Assignment of Rents and Leases, or otherwise) of the addresses of such mortgagee and/or deed of trust holder. Tenant further agrees that if Landlord shall have failed to cure such default within the time provided for in this Lease, then the mortgagee and/or deed of trust holder shall have an additional thirty (30) days within which to cure such default or if such default cannot be cured within that time, then such additional time as may be necessary if within such thirty (30) days any mortgagee and/or deed of trust holder has commenced and is diligently pursuing the remedies necessary to cure such default (including but not limited to commencement of foreclosure proceedings if necessary to effect such cure), in which event this Lease shall not be terminated while such remedies are being so diligently pursued.

8.5 Attornment.

In the event of a transfer of Landlord's interest in the Leased Premises or the purchase of the Building or Landlord's interest therein in a foreclosure sale or by deed in lieu of foreclosure under any deed of trust or mortgage or pursuant to a power of sale contained in a deed of trust or mortgage, Tenant shall, on demand by the owner of the Building or the real property of which the Leased Premises form a part, or both, attorn to and recognize the transferee or purchaser of Landlord's interest as Landlord under this Lease for the balance of the then remaining term and thereafter this Lease shall continue as a direct lease between such person as "Landlord" and Tenant as "Tenant", except that such transferee or purchaser shall not be liable for any act or omission of Landlord prior to such lease termination or such person's succession to title.

8.6 Approval by Mortgagee.

This Lease is subject to review and approval of Landlord's mortgagee or deed of trust holder and will not be effective until such approval is obtained.

## ARTICLE IX
## MISCELLANEOUS

9.1 No Constructive Waiver.

The receipt of rent by Landlord, with knowledge of any breach of this Agreement by Tenant or of any default on the part of Tenant in the observance or performance of the provisions of this Lease, shall not be deemed to be a waiver of any provision of this Lease. No failure on the part of Landlord to enforce any covenant or provision herein contained, nor any waiver of any right thereunder by Landlord, unless in writing, shall discharge or invalidate such covenant or provision or affect the right of Landlord to enforce the same in the event of any subsequent breach or default. Neither acceptance of the keys nor any other act or thing done by Landlord or any agent or employee during or after the term herein demised shall be deemed to be an acceptance of a surrender of the Leased Premises, excepting only an agreement in writing signed by Landlord accepting or agreeing to accept such a surrender.

9.2 Broker's Commission.

The parties hereto agree that no other broker was involved in procuring or negotiating this Lease other than Long and Foster Commercial and Donohoe Real Estate Services, and the parties hereto agree to hold each other harmless from any and all claims from any other brokerage fees.

9.3 Waiver of Trial by Jury.

Tenant waives trial by jury of any or all issues arising in any action, or proceedings between the parties hereto, or their successors, arising out of or in any way connected with this Lease, or any of its provisions, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises and/or any claim of injury or damage, and any statutory remedy.

9.4 Attorney's Fees.

Tenant agrees to pay, as additional rental, all attorney's fees and expenses of Landlord incurred in Landlord's successful action to enforce any of Tenant's obligations under this Lease, or in any litigation or negotiation in which Landlord shall become involved, through, or on account of Tenant.

9.5 Time of Essence.

Time is of the essence in the performance of all of Tenant's obligations under this Lease.

9.6 Governing Law.

This Lease shall be construed and governed by the laws of the State in which the Leased premises are located. Should any provisions of this Lease and/or its conditions be illegal or not enforceable under the laws of such State, it or they shall be considered severable, and the Lease and its conditions shall remain in force and be binding upon the parties as though the said provisions had never been included.

9.7 Force Majeure.

The term "default" as used in this Lease means default in the performance or observance of any of the terms, covenants, agreements, or conditions contained herein, exclusive of any period of grace required to constitute an event of default. However, if by any reason of force majeure the Landlord is unable in whole or in part to carry out the agreements on its part contained in this Lease or any of the other documents, the Landlord shall not be deemed in default during the continuance of such inability. The term "force majeure" as used herein shall include, without limitation, the following: acts of God; strikes, lockouts or other industrial disturbances; acts of public enemies; orders of any kind of the government of the United States or of the State in which the Leased Premises are located or of any subdivision thereof or any local government, of any of their departments, agencies or officials, or any civil or military authority; insurrections; riots; epidemics; landslides; lightning; earthquakes; fire; hurricanes; storms; floods; washouts; droughts; arrests; restraint of government and people; civil disturbances; explosions; breakage or accident to machinery, transmission pipes or canals; partial or entire failure of utilities; or any other cause or event not reasonably within the control of Landlord, it being agreed that the settlement of strikes, lockouts and other industrial disturbances shall be entirely within the discretion of Landlord, and Landlord shall not be required to make settlement of strikes, lockouts and other industrial disturbances by acceding to the demands of the opposing party or parties when such course is, in the judgment of the applicable party, unfavorable to it.

9.8 Notices.

All notices required under this Lease shall be deemed to be properly served if sent by United States certified mail, postage prepaid, by facsimile transmission, or by recognized overnight courier (a) if to Landlord, addressed to Landlord c/o Donohoe Real Estate Services, Inc., Suite 210, 1110 Bonifant Street, Silver Spring, Maryland 20910, or at such other address as Landlord may have from time to time designate by written notice to Tenant, (b) if to Tenant, addressed to Tenant at 315 12th St., NE, #100, Washington, DC 20002, or at such other address as Tenant may have designated from time to time by written notice to Landlord and (c) if to any mortgagee or holder of a deed of trust, at such address as such mortgagee or holder of deed of trust shall have designated from time to time. The date of service of such notices shall be the date such notices are postmarked.

9.9 Successors and Assigns.

Subject to Section 3.13 hereof, this Lease and the covenants, agreements, obligations and restrictions herein contained, shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns.

9.10 Gender and Number.

Words of any gender used in this Lease shall be deemed to include any other gender and words in the singular shall be deemed to include the plural when the sense requires.

9.11 Section Headings.

The headings as to contents of particular sections herein are inserted only for convenience, and they are in no way to be construed as a part of this Lease or as a limitation on the scope of the particular sections to which they refer.

9.12 Personal Guaranty. A personal guaranty is attached hereto as Exhibit "B".

9.13 Entire Agreement.

This Lease contains all the agreements and conditions made between the parties hereto and may not be modified orally or in any other manner than by agreement in writing, signed by all parties hereto, or their respective successors and interests.

[SIGNATURES ON NEXT PAGE.]

IN WITNESS WHEREOF, the parties hereto have caused this Lease to be duly executed, all done the day and year first hereinbefore written.

Witness:

DEAN R. DREWYER
(Printed Name of Person Signing)

LANDLORD: WWDC INDUSTRIAL PARK, LLC

By: Rory S. Coakley

Title Co-Manager

Rory S. Coakley
(Printed Name of Person Signing)

Attest or Witness:

John B. Williams III
(Printed Name of Person Signing)

TENANT: ~~DC~~ DIAPER BANK

By:

Title: Executive Director

Carinne R. Cannon
(Printed Name of Person Signing)

H:\2013\Dean\wwdc-dc diaper bank-nnn-lse-2013.doc

Exhibit "A"




WWDC Industrial Park
8858 Monard Drive
Silver Spring, MD 20910

3,050 rentable square feet

Exhibit "B"

**PERSONAL GUARANTY**

FOR VALUE RECEIVED, and in consideration of and as an inducement to the execution of the attached Lease Agreement, dated the 11th day of July, 2013 by and between WWDC INDUSTRIAL PARK, LLC, a limited liability company, as "Landlord", and DC DIAPER BANK a District of Columbia corporation, as "Tenant", the undersigned (hereinafter collectively referred to as "Guarantor" whether the undersigned be one or more than one party) do hereby absolutely guaranty to Landlord the full and complete payment of the rent and other charges to Landlord to be paid by Tenant under said Lease Agreement, and the full and complete performance by said Tenant of all of the other terms, conditions, covenants, and agreements of said Lease Agreement for the Leased Premises located at 8858 Monard Drive, Silver Spring, MD 20910.

This Guaranty shall remain in full force and effect during the Lease Agreement.

Guarantor agrees:

a) That Landlord may, in its discretion, extend the time or manner of payment of all or any part of the rent under said Lease Agreement without notice to or consent of the Guarantor, and,

b) That Landlord may exercise or forbear from exercising any rights against the Tenant under said Lease Agreement or otherwise act or forbear from acting, and may settle or compromise any rent which may become due under said Lease Agreement without notice to or consent of Guarantor or grant or make any accommodations, alterations, modifications, indulgence, to Tenant, all without releasing Guarantor from its obligations hereunder or limiting or impairing its liability. The Guarantor further agrees that its liability under this Guaranty shall be primary, and that in any right of action which shall accrue to Landlord under said Lease, the Landlord may, at its option, proceed against the undersigned without having commenced any action, or having obtained any judgment and without attempting to collect or proceed against Tenant. In the event there is more than one signatory to this Guaranty, each of the undersigned hereby agrees that its liability shall be joint and several and that the Landlord may proceed against all or any of them for full or partial satisfaction of the obligation the undersigned are hereby guarantying without in anyway affecting or diminishing the Landlord's rights under this Guaranty.

This Guaranty shall be binding upon the respective successors, assigns, heirs and administrators of the undersigned and shall inure to the benefit of the successors, personal representatives and assigns of Landlord.

If Landlord at any time is compelled to take any action or proceeding in court or otherwise to enforce or compel compliance with the terms of this Guaranty, the Guarantor shall, in addition to any other rights or remedies to which Landlord may be entitled hereunder or as a matter of law or in equity, be obligated to pay all costs, including Attorney's Fees, incurred or expended by Landlord in connection therewith.

The undersigned further represents to the Landlord, as an inducement for it to make said Lease, that the undersigned has a substantial financial interest in the Tenant.

The undersigned represent and warrant that this Guaranty shall be valid and effective and fully enforceable, in accordance with its terms against the Guarantor.

Notwithstanding anything to the contrary stated herein, the Guarantor's liability under this Personal Guaranty shall be limited to an amount equal to the lesser of: (i) the Basic Rent due for eighteen (18) months following the date that the Landlord makes written demand for payment under this Personal Guaranty; or (ii) the Basic Rent due for the remaining term of the Lease at the time that the Landlord makes written demand for payment under this Personal Guaranty.

IN WITNESS WHEREOF, the Guarantor(s) has hereunto caused this Guaranty to be executed this 10th day of July, 2013.

**WITNESS:**

Signature

John B. Williams III

Name Printed

**WITNESS:**

Signature

Corinne R. Cannon

Name Printed

**GUARANTOR:** CORINNE RAEBURN CANNON

Corinne Raeburn Cannon – SSN#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
315 12th St, NE, Washington, DC 20002

**GUARANTOR:** JOHN BELL WILLIAMS, III

John Bell Williams, III – SSN#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
315 12th St, NE, Washington, DC 20002

DC DIAPER BANK
WWW.DCDIAPERBANK.ORG
202-656-8503
315 12TH STREET, NE #100
WASHINGTON, DC 20002

15-122-540

118

7/10 20 13

PAY TO THE ORDER OF WWDC Industrial Park LLC $ 4,320.84

Four Thousand Three Hundred Twenty — 84/100 DOLLARS

Security Features Included. Details on Back.

BLUE CLASSIC

WELLS FARGO BANK, N.A.
WELLSFARGO.COM

FOR 8858 Menard Dr.
~~security deposit + 3rd~~ rent

MP

⑆054001220⑆2000057813659⑈ 0118

LEASE MODIFICATION AND EXTENSION AGREEMENT

THIS AGREEMENT, made this 27th day of July 2015, by and between WWDC Industrial Park, LLC, hereinafter called the "Landlord", and DC DIAPER BANK, A District of Columbia 501(c)3 corporation, hereinafter called the "Tenant".

W I T N E S S E T H:

WHEREAS, the Landlord and the Tenant entered into a certain Lease Agreement dated July 11, 2013 whereby the Tenant leased approximately 3,050 rentable square feet of warehouse space located at 8858 Monard Drive, Silver Spring, Maryland 20910, for an initial term of three (3) years and two (2) months beginning on the 1st day of August, 2013 and ending on the 30th day of September, 2016, upon the terms and conditions therein fully set out; and,

WHEREAS, the parties hereto now desire to increase the square footage leased and extend the term of said Lease for an additional period of three (3) years beyond the expiration of the current Lease Term, which extends the Lease Term to September 30, 2019.

NOW, THEREFORE, THIS LEASE MODIFICATION AND EXTENSION AGREEMENT WITNESSETH, that in consideration of the premises and of the mutual covenants herein contained, the parties undertake and agree as follows:

1. Section 1.1 Premises. 2,750 rentable square feet of additional space located at Bay 8856 Monard Drive, Silver Spring, MD, as outlined in yellow on Exhibit "A", such space being located within WWDC Building #5, is hereby added to the existing warehouse space totaling 3,050 rentable square feet located at Bay 8858 Monard Drive, Silver Spring, MD within WWDC Building #5, as outlined in orange on Exhibit "A", for a new combined total of 5,800 rentable square feet.

2. Section 1.2 Term - Effective Date. The effective date for this Lease Modification and Extension Agreement is September 1, 2015 and the new termination date for the extended Lease Term shall be September 30, 2019.

3. Section 2.1 Basic Rent. The Basic Rental schedule, which heretofore was outlined in Paragraph 2.1 of the Lease Agreement dated July 11, 2013, is hereby changed for the extended Lease Term as follows:

| Term | Monthly |
|---|---|
| September 1, 2015 – August 31, 2016 | $4,350.00 |
| September 1, 2016 – October 31, 2016 | $2,240.25 |
| November 1, 2016 – August 31, 2017 | $4,480.50 |
| September 1, 2017 – October 31, 2017 | $2,307.46 |
| November 1, 2017 – August 31, 2018 | $4,614.92 |
| September 1, 2018 – September 30, 2019 | $4,753.36 |

4. Section 2.3 Real Estate Taxes and Section 3.9 Utilities. Tenant's pro-rata share of the Real Estate Taxes and Utilities, which heretofore has been 6.29% of the total Real Estate Tax and Utility bills for WWDC#5, shall be changed to 11.97% of the total Real Estate Tax and Utility bills for WWDC#5.

5. Section 2.4 Snow Removal and Insurance Expenses. Tenant's pro-rata share of the Snow Removal and Insurance Expenses which heretofore has been 1.15% for WWDC Industrial Park Buildings 1-8 shall be changed to 2.18% of the total bills for WWDC Industrial Park Buildings 1-8.

6. Tenant Improvements. Landlord, at its sole cost and expense, shall provide the following Tenant Improvements:
    a) Furnish and install up to approximately 300 square feet of heated and air-conditioned, building standard new office space adjacent to the existing office space as outlined on Exhibit "B";
    b) Thoroughly clean the existing restroom in Bay 8856 and add new mirror and exhaust fan;
    c) Relamp or replace where necessary all eight foot (8') fluorescent fixtures in Bay 8856;
    d) Demo rear drywall knock-out panel in the existing demising wall that separates Bay 8856 and 8858.

Notwithstanding the above Tenant Improvements, Tenant will occupy the Premises in an "as-is" condition. Should Tenant elect to do alterations to the Premises, said alterations to the Premises shall be installed at Tenant's expense only in accordance with plans and specifications which have been previously submitted to and approved in writing by Landlord. No alterations or physical additions in or to the Premises may be made without Landlord's prior written consent; however, Landlord may withhold its consent to any alteration or addition that would affect the Project's structure or its HVAC, plumbing, electrical, or mechanical systems. All alterations, additions, or improvements made to the Premises shall, at Landlord's option, either be removed by Tenant prior to the end of the term (and Tenant shall repair all damage caused thereby), or remain on the Premises at the end of the term without compensation to Tenant. All alterations, additions, and improvements shall be constructed, maintained, and used by Tenant, at its risk and expense, in accordance with all laws, ordinances, rules and regulations, and pursuant to all requisite permits (if any such permits are required by applicable governmental authorities).

7. Personal Guaranty. Per the Personal Guaranty attached to the Lease Agreement dated July 11, 2013 as Exhibit "B", the Guarantor's liability amount shall be changed as follows:
"Notwithstanding anything to the contrary stated herein, the Guarantor's liability under this Personal Guaranty shall be limited to an amount equal to the lesser of: (i) the Basic Rent due for nine (9) months following the date that the Landlord makes written demand for payment under this Personal Guaranty; or (ii) the Basic Rent due for the remaining term of the Lease at the time that the Landlord makes written demand for payment under this Personal Guaranty."

All of the covenants and conditions made applicable by the provisions of said Lease Agreement to the current Lease Term shall be equally applicable to the newly extended Lease Term.

IN ALL RESPECTS, except as hereinbefore expressly stated, all terms and provisions of said Lease Agreement of July 11, 2013 are hereby ratified and confirmed.

IN WITNESS WHEREOF, the Landlord and Tenant have caused this Lease Modification and Extension Agreement to be executed in its behalf by one of its duly authorized officers or representatives as the day and year first hereinabove written.

WITNESS: [signature]

LANDLORD: WWDC INDUSTRIAL PARK, LLC

BY: [signature]
Rory S. Coakley, Co-Manager

WITNESS: [signature]

DEAN R. DREWYER
Name Printed

TENANT: DC DIAPER BANK,
A District of Columbia 501(c)3 corporation

BY: [signature]
Corrine Raeburn Cannon

H:\2015\Dean\wwdc-dc diaper-lse mod&ext-7-13-15.doc

Exhibit "A"




WWDC Industrial Park
8856 - 8858 Monard Drive
Silver Spring, MD 20910

5,800 rentable square feet

Exhibit "B"


ROLL-UP DOOR
LOADING DOCK
MAIN
ENTRANCE
DOOR
BAY 8858
FRONT
EXHIBIT "B"
EXISTING OFFICE SPACE
EXISTING
HVAC UNIT
EXISTING
DOOR
NEW
DOOR
NEW OFFICE SPACE
NEW
DOOR
HVAC UNIT
DEDICATED
4' HIGH x 3' WIDE
WINDOW to WAREHOUSE
NEW
DOOR

LEASE MODIFICATION AND EXTENSION AGREEMENT

THIS LEASE MODIFICATION AND EXTENSION AGREEMENT (this "Agreement") is made and entered into on May 20, 2019, by and between WWDC Industrial Park, LLC, hereinafter called the "Landlord," and DC DIAPER BANK, A District of Columbia 501(c)3 corporation, hereinafter called the "Tenant." Landlord and Tenant are collectively referred to herein as the "parties."

WITNESSETH:

WHEREAS, Landlord and Tenant entered into that certain Lease dated July 11, 2013 (the "Original Lease"), whereby Tenant leased approximately 3,050 rentable square feet of warehouse space located at 8858 Monard Drive, Silver Spring, Maryland 20910 (the "Initial Premises"), for an initial term of three (3) years and two (2) months beginning on the 1st day of August, 2013 and ending on the 30th day of September, 2016 (the "Initial Term").

WHEREAS, Landlord and Tenant modified the Original Lease per the terms and conditions of that certain Lease Modification and Extension Agreement dated July 27, 2015 (the "First Amendment;" the Original Lease, the First Amendment and this Agreement are, collectively, the "Lease"), which First Amendment increased the square footage of the Initial Premises from 3,050 rentable square feet to 5,800 rentable square feet (the "Existing Premises"), and extended the Initial Term to September 30, 2019 (the "Lease Term"), upon the terms and conditions therein fully set out.

WHEREAS, the parties hereto now desire to (a) increase the square footage of the Existing Premises from 5,800 rentable square feet to 8,850 rentable square feet (the "Leased Premises"), and (b) extend the Lease Term for an additional period of five (5) years beyond the current expiration of the Lease, to September 30, 2024.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties undertake and agree as to amend the Lease follows:

1. Section 1.1 Premises. 3,050 rentable square feet of additional space located at Bay 8860 Monard Drive, Silver Spring, MD, as outlined in yellow on Exhibit "A," such space being located within WWDC Building #5, is hereby added to the Existing Premises located at Bays 8856 – 8858 Monard Drive, Silver Spring, MD within WWDC Building #5, as outlined in orange on Exhibit "A," for a new combined total of 8,850 rentable square feet. All references in the Lease to the Leased Premises shall refer to the Leased Premises as defined herein and consisting of 8,850 rentable square feet, as more particularly described in this Agreement. All references in the Lease to "the Lease" or "this Lease" shall refer to the Lease as amended by this Agreement. Capitalized terms used herein without definition shall have the meaning ascribed to such terms in the Lease.

2. Section 1.2 Term - Effective Date. The effective date for this Agreement is June 1, 2019 and the new expiration date of the Lease shall be September 30, 2024. All references in the Lease to the "Lease Term" shall refer to the Lease Term as extended herein, such that the Lease Term expires on September 30, 2024.

3. Section 2.1 Basic Rent. The Basic Rental schedule, which heretofore was outlined in Paragraph 3 of the First Amendment, is hereby changed for the Lease Term, as amended in by this Agreement, as follows:

| Term | Monthly |
|---|---|
| June 1, 2019 – September 30, 2019 | $6,000.40 |
| October 1, 2019 – May 31, 2020 | $7,249.63 |
| June 1, 2020 – May 31, 2021 | $7,467.11 |
| June 1, 2021 – May 31, 2022 | $7,691.13 |
| June 1, 2022 – May 31, 2023 | $7,921.86 |
| June 1, 2023 – September 30, 2024 | $8,159.52 |

4. Section 2.3 Real Estate Taxes and Section 3.9 Utilities. Based on the total rentable square footage of the Leased Premises reflected in this Agreement (8,850 rentable square feet), Tenant's pro-rata share of the Real Estate Taxes and Utilities, which heretofore has been 11.97% of the total Real Estate Tax and Utility bills for WWDC#5, shall be changed to 18.26% of the total Real Estate Tax and Utility bills for WWDC#5.

CAM? It s/b CAM and Insurance Expenses. See MC Email dated 5/20/16. Same Typo carried forward to this Lease Extension.

5. Section 2.4 Snow Removal and Insurance Expenses. Based on the total rentable square

rata share of the Snow Removal and Insurance Expenses, which heretofore has been 2.18% for WWDC Industrial Park Buildings 1-8, shall be changed to 3.45% of the total bills for WWDC Industrial Park Buildings 1-8.

6. Tenant Improvements. Landlord, at its sole cost and expense, shall provide the following improvements to the Leased Premises (the "Tenant Improvements"):

a) Thoroughly clean the existing restroom in Bay 8860; and
b) Demo two (2) 10' X 10' openings in the existing drywall demising wall that separates Bay 8858 and 8860 in location designated by Tenant.

Except as otherwise provided above with respect to the Tenant Improvements, Tenant will occupy the Leased Premises in an "as-is" condition. Should Tenant elect to do alterations to the Leased Premises, said alterations to the Premises shall be installed at Tenant's expense only in accordance with plans and specifications approved in writing by Landlord. No alterations or physical additions in or to the Leased Premises may be made without Landlord's prior written consent (which consent shall not be unreasonably withheld, conditioned, or delayed); provided, however, Landlord may withhold its consent to any alteration or addition that would affect the Building's structure or its HVAC, plumbing, electrical, or mechanical systems. All alterations, additions, or improvements made to the Leased Premises shall, at Landlord's option, either be removed by Tenant prior to the end of the Lease Term (and Tenant shall repair all damage caused thereby), provided that Landlord informs Tenant in writing at the time of granting consent to any alterations that Landlord requires such alterations to be removed at the end of the Lease Term, or remain on the Leased Premises at the end of the Lease Term without compensation to Tenant. All alterations, additions, and improvements shall be constructed, maintained, and used by Tenant, at its risk and expense, in accordance with all laws, ordinances, rules and regulations, and pursuant to all requisite permits (if any such permits are required by applicable governmental authorities).

7. Right to Terminate. Beginning on June 1, 2022, but only in the event Tenant can demonstrate that it needs more area than the Leased Premises and Landlord is unable to lease to Tenant an additional area contiguous to the Leased Premises of at least approximately 3,000 square feet in the Building, or other premises consisting of two (2) contiguous warehouse bays of at least approximately 5,000 square feet within the Building, then Tenant shall have a right to terminate the Lease for the Leased Premises provided (i) Tenant delivers at least six (6) months' prior written notice of termination to Landlord, and (ii) Tenant pays a termination fee at the time that the termination notice is delivered equal to the unamortized transaction costs plus 6% annual interest, including commissions, improvement allowance, abatement and reasonable legal fees. The termination date shall be the last day of the Lease Year (as defined in the Lease) in which the termination notice is sent. If Landlord is able to accommodate Tenant's expansion needs, as stated above, Tenant will be able to lease the additional space at current market rent and other concessions that Landlord provides in the Building.

All of the covenants and conditions made applicable by the provisions of this Agreement to the current Lease Term shall be equally applicable to the newly modified and extended Lease Term as provided in this Agreement. IN ALL RESPECTS, except as hereinbefore expressly stated, all terms and provisions of the Lease are hereby ratified and confirmed.

IN WITNESS WHEREOF, Landlord and Tenant have caused this Agreement to be executed on its behalf by one of its duly authorized officers or representatives as the day and year first hereinabove written.

| | |
|---|---|
| WITNESS: | LANDLORD: WWDC INDUSTRIAL PARK, LLC |
| [signature] | BY: [signature] |
| | Rory S. Coakley, Co-Manager |
| WITNESS: | TENANT: DC DIAPER BANK, A District of Columbia 501(c)3 corporation |
| [signature] | BY: [signature] |
| John B. Williams, III | ~~Corrine~~ Raeburn Cannon, Executive Director |
| Name Printed | Corinne |

C:\Users\jwilliams\AppData\Local\Microsoft\Windows\INetCache\Content.Outlook\A07U6CIR\Lease Modification and Extension Agreement (clean PFG 5-8-19) (00509900x87C35).docx

Exhibit "A"




WWDC Industrial Park
8856 - 8860 Monard Drive
Silver Spring, MD 20910

8,850 rentable square feet

{FDALAW 00509900/v1/10784/02/5/8/2019 03:17 PM}

# LEASE MODIFICATION AGREEMENT

THIS AGREEMENT, made this 8th day of June 2021, by and between WWDC Industrial Park, LLC, hereinafter called the "Landlord", and DC DIAPER BANK, A District of Columbia 501(c)3 corporation, hereinafter called the "Tenant".

W I T N E S S E T H:

WHEREAS, the Landlord and the Tenant entered into a certain Lease Agreement dated July 11, 2013 whereby the Tenant leased approximately 3,050 rentable square feet of warehouse space located at 8858 Monard Drive, Silver Spring, Maryland 20910, for an initial term of three (3) years and two (2) months beginning on the 1st day of August, 2013 and ending on the 30th day of September, 2016 and modified and extended by Lease Modification and Extension Agreement dated July 27, 2015, which increased the square footage leased to 5,800 rentable square feet and extended the lease term to September 30, 2019 and extended by Lease Modification and Extension Agreement dated May 20, 2019, whereby increased the square footage leased to 8,850 and extended the lease term to September 30, 2024, upon the terms and conditions therein fully set out; and,

WHEREAS, the parties hereto now desire to increase the square footage leased for a period of one (1) year.

NOW, THEREFORE, THIS LEASE MODIFICATION AGREEMENT WITNESSETH, that in consideration of the premises and of the mutual covenants herein contained, the parties undertake and agree as follows:

1. Section 1.1 Premises. 2,500 rentable square feet of additional space located at Bay 8846 Monard Drive, Silver Spring, MD (“Additional Premises”), as outlined in yellow on Exhibit “A”, such space being located within WWDC Building #6, is hereby added to the existing warehouse space totaling 8,850 rentable square feet located at Bays 8856 – 8860 Monard Drive, Silver Spring, MD (“Existing Warehouse Space”) within WWDC Building #5, as outlined in orange on Exhibit “A”, for a new combined total of 11,350 rentable square feet.

2. Section 1.2 Term - Effective Date. The effective date for this Lease Modification Agreement is June 15, 2021 and termination date for the Additional Premises shall be May 31, 2022, unless otherwise agreed upon by Tenant and Landlord.

   Notwithstanding the foregoing, Tenant shall have the right to extend the term of this Lease for two (2) additional, one (1) year lease term (the “Additional Premises Renewal Term”), conditioned upon Tenant satisfying each of the following conditions prior to such Additional Premises Renewal Term taking effect, a) Tenant is not in default under its Lease and has not sublet the Premises in violation of the Lease; b) Tenant has delivered to Landlord notice of its intention to exercise this option, not less than One Hundred Eighty (180) days prior to the end of the Lease Term; c) All terms and conditions of such Renewal Term shall be the same as contained in the Base Lease and this Lease Modification Agreement except that the Basic Rental for the Additional Premises Renewal Term shall be at the then current rate for the existing warehouse space at the time of renewal or $10.43/sq.ft for the 1st Renewal Term and $10.74/sq.ft. for the 2nd Renewal Term.

3. Section 2.1 Basic Rent. The Basic Rental schedule for the Additional Premises during the Lease Term shall be as follows:

*$2,108.33/30* 16 days (6/15-6/30) = $1,124.44*

| Term | Monthly |
|---|---|
| June 15, 2021 – May 31, 2022 | $2,108.33 |

In TT's Lease in WWDC5, TT pays its PRS of CAM (3.45%), (8,850SF),contrary to what is stated in Sec. 5 of Am. dated 5/20/19

4. Section 2.3 Real Estate Taxes and Section 3.9 Utilities. Tenant’s pro-rata share of the Real Estate Taxes and Utilities for the Additional Premises shall be 4.22% of the total Real Estate Tax and Utility bills for WWDC#6.

5. Section 2.4 Snow Removal and Insurance Expenses. Tenant’s pro-rata share of the Snow Removal and Insurance Expenses for the Additional Premises shall be 0.94% of the total bills for WWDC Industrial Park.

6. Tenant Improvements. Tenant shall occupy the Premises in an “as-is” condition. Should Tenant elect to do alterations to the Premises, said alterations to the Premises shall be installed at Tenant's expense only in accordance with plans and specifications approved

in writing by Landlord. No alterations or physical additions in or to the Premises may be made without Landlord's prior written consent; however, Landlord may withhold its consent to any alteration or addition that would affect the Project's structure or its HVAC, plumbing, electrical, or mechanical systems. All alterations, additions, or improvements made to the Premises shall, at Landlord's option, either be removed by Tenant prior to the end of the term (and Tenant shall repair all damage caused thereby), or remain on the Premises at the end of the term without compensation to Tenant. All alterations, additions, and improvements shall be constructed, maintained, and used by Tenant, at its risk and expense, in accordance with all laws, ordinances, rules and regulations, and pursuant to all requisite permits (if any such permits are required by applicable governmental authorities).

All of the covenants and conditions made applicable by the provisions of said Lease Modification Agreement to the current Base Lease shall be equally applicable to the newly modified Additional Premises and Term(s).

IN ALL RESPECTS, except as hereinbefore expressly stated, all terms and provisions of said Lease Agreement of July 11, 2013 are hereby ratified and confirmed.

IN WITNESS WHEREOF, the Landlord and Tenant have caused this Lease Modification Agreement to be executed in its behalf by one of its duly authorized officers or representatives as the day and year first hereinabove written.

WITNESS: LANDLORD: WWDC INDUSTRIAL PARK, LLC

________________________ BY:__________________________________________
Rory S. Coakley, Co-Manager

WITNESS: TENANT: DC DIAPER BANK,
A District of Columbia 501(c)3 corporation

___________________________________ BY:__________________________________________
Corrine Raeburn Cannon

___________________________________
Name Printed

C:\Users\arynr\My SecuriSync\ArynR(2)\2021\Conor\wwdc-dc diaper-lse mod-rdlne-6-3-21.docx

Signatures on the following page

in writing by Landlord. No alterations or physical additions in or to the Premises may be made without Landlord's prior written consent; however, Landlord may withhold its consent to any alteration or addition that would affect the Project's structure or its HVAC, plumbing, electrical, or mechanical systems. All alterations, additions, or improvements made to the Premises shall, at Landlord's option, either be removed by Tenant prior to the end of the term (and Tenant shall repair all damage caused thereby), or remain on the Premises at the end of the term without compensation to Tenant. All alterations, additions, and improvements shall be constructed, maintained, and used by Tenant, at its risk and expense, in accordance with all laws, ordinances, rules and regulations, and pursuant to all requisite permits (if any such permits are required by applicable governmental authorities).

All of the covenants and conditions made applicable by the provisions of said Lease Modification Agreement to the current Base Lease shall be equally applicable to the newly modified Additional Premises and Term(s).

IN ALL RESPECTS, except as hereinbefore expressly stated, all terms and provisions of said Lease Agreement of July 11, 2013 are hereby ratified and confirmed.

IN WITNESS WHEREOF, the Landlord and Tenant have caused this Lease Modification Agreement to be executed in its behalf by one of its duly authorized officers or representatives as the day and year first hereinabove written.

WITNESS:

LANDLORD: WWDC INDUSTRIAL PARK, LLC

BY: ______________________

Rory S. Coakley, Co-Manager

WITNESS:

TENANT: DC DIAPER BANK,
A District of Columbia 501(c)3 corporation

______________________

BY: ______________________

~~Corrine~~ Raeburn Cannon
Corinne CRC

______________________

Name Printed

[illegible] 2021 [illegible] 6-3-21.docx

Exhibit "A"




WWDC Industrial Park
8846 Monard Drive
Silver Spring, MD 20910

2,500 rentable square feet




WWDC Industrial Park
8856 - 8860 Monard Drive
Silver Spring, MD 20910

8,850 rentable square feet

# LEASE MODIFICATION AGREEMENT

THIS AGREEMENT, made this 5th day of April 2022, by and between WWDC Industrial Park, LLC, hereinafter called the "Landlord", and GREATER DC DIAPER BANK, A District of Columbia 501(c)3 corporation, hereinafter called the "Tenant".

WITNESSETH:

WHEREAS, the Landlord and the Tenant entered into a certain Lease Agreement dated July 11, 2013 whereby the Tenant leased approximately 3,050 rentable square feet of warehouse space located at 8858 Monard Drive, Silver Spring, Maryland 20910, for an initial term of three (3) years and two (2) months beginning on the 1st day of August, 2013 and ending on the 30th day of September, 2016, modified and extended by Lease Modification and Extension Agreement dated July 27, 2015, which increased the square footage leased to 5,800 rentable square feet and extended the lease term to September 30, 2019, then modified and extended by Lease Modification and Extension Agreement dated May 20, 2019, which added 8860 Monard Drive and increased the square footage leased to 8,850 rentable square feet and modified by Lease Modification Agreement dated June 8, 2021, added 8846 Monard Drive in Building #6 and increased the square footage leased to 11,350 rentable square feet, upon the terms and conditions therein fully set out; and,

WHEREAS, the parties hereto now desire to increase the square footage leased for a period of two (2) years and four (4) months.

NOW, THEREFORE, THIS LEASE MODIFICATION AGREEMENT WITNESSETH, that in consideration of the premises and of the mutual covenants herein contained, the parties undertake and agree as follows:

1. Section 1.1 Premises. 2,500 rentable square feet of additional space located at Bay 8846 Monard Drive, Silver Spring, MD ("Additional Premises"), as outlined in yellow on Exhibit "A", such space being located within WWDC Building #6, is hereby added to the existing warehouse space totaling 8,850 rentable square feet located at Bays 8856 – 8860 Monard Drive, Silver Spring, MD ("Existing Warehouse Space") within WWDC Building #5, as outlined in orange on Exhibit "A", for a new combined total of 11,350 rentable square feet.

2. Section 1.2 Term - Effective Date. The effective date for this Lease Modification Agreement is June 1, 2022 and termination date for the Additional Premises shall be September 30, 2024, unless otherwise agreed upon by Tenant and Landlord.

3. Section 2.1 Basic Rent. The Basic Rental schedule for the Additional Premises during the Lease Term shall be as follows:

| Term | Monthly |
|---|---|
| June 1, 2022 – May 31, 2023 | $2,172.91 |
| June 1, 2023 – May 31, 2024 | $2,237.50 |
| June 1, 2024 – September 30, 2024 | $2,304.62 |

4. Section 2.3 Real Estate Taxes and Section 3.9 Utilities. Tenant's pro-rata share of the Real Estate Taxes and Utilities for the Additional Premises shall be 4.22% of the total

Real Estate Tax and Utility bills for WWDC#6.

5. Section 2.4 Snow Removal and Insurance Expenses. Tenant's pro-rata share of the Snow Removal and Insurance Expenses for the Additional Premises shall be 0.94% of the total bills for WWDC Industrial Park.

6. Tenant Improvements. Tenant shall occupy the Premises in an "as-is" condition. Should Tenant elect to do alterations to the Premises, said alterations to the Premises shall be installed at Tenant's expense only in accordance with plans and specifications approved in writing by Landlord. No alterations or physical additions in or to the Premises may be made without Landlord's prior written consent; however, Landlord may withhold its consent to any alteration or addition that would affect the Project's structure or its HVAC, plumbing, electrical, or mechanical systems. All alterations, additions, or improvements made to the Premises shall, at Landlord's option, either be removed by Tenant prior to the end of the term (and Tenant shall repair all damage caused thereby), or remain on the Premises at the end of the term without compensation to Tenant. All alterations, additions, and improvements shall be constructed, maintained, and used by Tenant, at its risk and expense, in accordance with all laws, ordinances, rules and regulations, and pursuant to all requisite permits (if any such permits are required by applicable governmental authorities).

All of the covenants and conditions made applicable by the provisions of said Lease Modification Agreement to the current Base Lease shall be equally applicable to the newly modified Additional Premises and Term(s).

IN ALL RESPECTS, except as hereinbefore expressly stated, all terms and provisions of said Lease Agreement of July 11, 2013 are hereby ratified and confirmed.

IN WITNESS WHEREOF, the Landlord and Tenant have caused this Lease Modification Agreement to be executed in its behalf by one of its duly authorized officers or representatives as the day and year first hereinabove written.

WITNESS:

DocuSigned by:
Conor Coakley
Conor Coakley
A7D8EAC25AEA4AE...

LANDLORD: WWDC INDUSTRIAL PARK, LLC

DocuSigned by:
BY: Rory S. Coakley
FC044612A2984D7...
Rory S. Coakley, Co-Manager

WITNESS:

RH Kolowé
Rebecca H. Kolowé
Name Printed

TENANT: DC DIAPER BANK,
A District of Columbia 501(c)3 corporation

BY: [signature]
~~Corrine~~ Raeburn Cannon
Carinne

C:\Users\arynr\My SecuriSync\ArynR(2)\2021\Conor\wwdc-dc diaper-lse mod-rdlne-4-14-21.docx

Exhibit "A"



WWDC INDUSTRIAL PARK #6
8800-8846 MONARD DRIVE
SILVER SPRING, MARYLAND 20910
Upper Level Plant
LOWER LEVEL PLAN
8846
8844
8842
8840
8838
8836
8834
8832
8830
8828
8826
8824
8822
8818
8816
8810
8808
8806
8804
8802

WWDC Industrial Park
8846 Monard Drive
Silver Spring, MD 20910

2,500 rentable square feet




WWDC Industrial Park
8856 - 8860 Monard Drive
Silver Spring, MD 20910

DocuSign

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: FC357C9979734E7B87A3317D2124F6BD | | Status: Completed |
| Subject: Please DocuSign: wwdc-dc diaper bank-lse ext-GDCDB - April 2022.pdf | | |
| Source Envelope: | | |
| Document Pages: 6 | Signatures: 2 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Aryn Robinson |
| AutoNav: Enabled | | 7101 Wisconsin Ave, Suite 700 |
| EnvelopeId Stamping: Enabled | | Bethesda, MD 20814 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | arynr@donohoe.com |
| | | IP Address: 209.190.252.226 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>4/5/2022 11:39:10 AM | Holder: Aryn Robinson<br>arynr@donohoe.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Rory S. Coakley<br>rory@coakleyrealty.com<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>Rory S. Coakley<br>FC044612A2984D7...<br><br>Signature Adoption: Pre-selected Style<br>Signed by link sent to rory@coakleyrealty.com<br>Using IP Address: 71.191.170.169 | Sent: 4/5/2022 11:42:41 AM<br>Viewed: 4/5/2022 11:57:35 AM<br>Signed: 4/5/2022 11:57:53 AM |

**Electronic Record and Signature Disclosure:**
Accepted: 4/5/2022 11:57:35 AM
ID: 27e01d30-f6f5-46b3-a3a9-9897bd6374aa

| | | |
|---|---|---|
| Conor Coakley<br>conorc@donohoe.com<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>Conor Coakley<br>A7D8EAC25AEA4AE...<br><br>Signature Adoption: Pre-selected Style<br>Signed by link sent to conorc@donohoe.com<br>Using IP Address: 209.190.252.226 | Sent: 4/5/2022 11:57:53 AM<br>Viewed: 4/6/2022 9:14:10 AM<br>Signed: 4/6/2022 9:14:17 AM |

**Electronic Record and Signature Disclosure:**
Accepted: 4/6/2022 9:14:10 AM
ID: b91cd64f-222a-4d69-aff0-46bf965e20db

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 4/5/2022 11:42:41 AM |
| Certified Delivered | Security Checked | 4/6/2022 9:14:10 AM |
| Signing Complete | Security Checked | 4/6/2022 9:14:17 AM |
| Completed | Security Checked | 4/6/2022 9:14:17 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, Donohoe Real Estate Services (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Donohoe Real Estate Services:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: arynr@donohoe.com

**To advise Donohoe Real Estate Services of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at arynr@donohoe.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Donohoe Real Estate Services**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to arynr@donohoe.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Donohoe Real Estate Services**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to arynr@donohoe.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Donohoe Real Estate Services as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Donohoe Real Estate Services during the course of your relationship with Donohoe Real Estate Services.

LEASE EXTENSION AGREEMENT

THIS AGREEMENT, made this 19 day of September 2023, by and between WWDC Industrial Park, LLC, hereinafter called the "Landlord", and Greater DC DIAPER BANK, A District of Columbia 501(c)3 corporation, hereinafter called the "Tenant".

WITNESSETH:

WHEREAS, the Landlord and the Tenant entered into a certain Lease Agreement dated July 11, 2013 whereby the Tenant leased approximately 3,050 rentable square feet of warehouse space located at 8858 Monard Drive, Silver Spring, Maryland 20910, for an initial term of three (3) years and two (2) months beginning on the 1st day of August, 2013 and ending on the 30th day of September, 2016, modified and extended by Lease Modification and Extension Agreement dated July 27, 2015, which increased the square footage leased to 5,800 rentable square feet and extended the lease term to September 30, 2019, then modified and extended by Lease Modification and Extension Agreement dated May 20, 2019, which added 8860 Monard Drive and increased the square footage leased to 8,850 rentable square feet and modified by Lease Modification Agreement dated June 8, 2021, added 8846 Monard Drive in Building #6 and increased the square footage leased to 11,350 rentable square feet, and Lease modification agreement dated April 5th 2022 which extended the term through September 30, 2024, upon the terms and conditions therein fully set out; and,

WHEREAS, the parties hereto now desire to increase the Term for a period of Five (5) years effective on October 1, 2024.

NOW, THEREFORE, THIS LEASE MODIFICATION AGREEMENT WITNESSETH, that in consideration of the premises and of the mutual covenants herein contained, the parties undertake and agree as follows:

2. Section 1.1 Term - Effective Date. The effective date for this Lease Extension Agreement is October 1, 2024

3. Section 2.1 Basic Rent. The Basic Rental schedule for the Additional Premises during the Lease Term shall be as follows:

| Term | Annually | Monthly |
|---|---|---|
| October 1, 2024 – September 30, 2025 | $153,225.00 | $12,769.00 |
| October 1, 2025 – September 30, 2026 | $157,822.00 | $13,152.00 |
| October 1, 2026 – September 30, 2027 | $162,556.00 | $13,546.00 |
| October 1, 2027 – September 30, 2028 | $167,433.00 | $13,953.00 |
| October 1, 2028 – September 30, 2029 | $172,456.00 | $14,371.00 |

4. Tenant Improvements. Tenant shall occupy the Premises in an "as-is" condition.

5. Option to Renew. Tenant shall have the right to extend the term of this Lease, which expires on September 30, 2029, for one (1) additional five (5) year lease term (the "Renewal Term") commencing on October 1, 2029, conditioned upon Tenant satisfying each of the following conditions prior to such Renewal Term taking effect:

(a) Tenant is not in default under this Lease and has not sublet the Leased Premises in violation of this Lease;

(b) Tenant has delivered to Landlord notice of its intention to exercise this option, not less than Two Hundred Seventy (270) days prior to the end of the Lease Term;

(c) All terms and conditions of such Renewal Term shall be the same as contained in this Lease except that the Basic Rent for the Renewal Term and the annual Basic Rent increases for the Renewal Term shall be at the then prevailing market rate for comparable buildings located within a two (2) mile radius of the Leased Premises. The 'market' rate shall be determined by Landlord and notice thereof shall be given to Tenant within fifteen (15) days after receiving such notice from Tenant. Tenant shall have fifteen (15) days after receiving such notice from Landlord to rescind its exercise of such option. If no acceptance is

received by Landlord within such additional thirty (30) day period, Tenant shall be considered to have rescinded its election to exercise this renewal option."

All of the covenants and conditions made applicable by the provisions of said Lease Extension Agreement to the current Base Lease shall be equally applicable to the newly modified Additional Premises and Term(s).

Except as expressly set forth in this Amendment to the contrary, Landlord's leasing of the Demised Premises to Tenant shall be upon and subject to the terms and provisions set forth in the Lease. To the extent of a conflict between the terms of the Lease and this Amendment, this Amendment shall control.

IN ALL RESPECTS, except as hereinbefore expressly stated, all terms and provisions of said Lease Agreement of July 11, 2013 are hereby ratified and confirmed.

IN WITNESS WHEREOF, the Landlord and Tenant have caused this Lease Modification Agreement to be executed in its behalf by one of its duly authorized officers or representatives as the day and year first hereinabove written.

WITNESS:

Conor Coakley

LANDLORD: WWDC INDUSTRIAL PARK, LLC

BY: Rory S. Coakley 9/20/2023

Rory S. Coakley, Co-Manager

WITNESS:

Name Printed

TENANT: GREATER DC DIAPER BANK,
A District of Columbia 501(c)3 corporation

BY: Jacquelyn L Lendsey

Jacquelyn L. Lendsey

N:\ArynR\2022\Conor\wwdc-dc diaper-lse mod and Exten-9-12-22 cc.docx